**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

INTERBAKE FOODS, L.L.C.,

        Plaintiff,

vs.

LARRY TOMASIELLO, BODEANS
BAKING COMPANY, L.L.C.,
BODEANS BAKING HOLDING
COMPANY, L.L.C., and BODEANS
WAFER COMPANY, L.L.C.,

        Defendant.

No. C06-4089-MWB

**MEMORANDUM OPINION AND
ORDER GRANTING IN PART AND
DENYING IN PART THE
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

_____

**TABLE OF CONTENTS**

*I.* **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *A. Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
   *B. Findings Of Fact* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
       *1. The provisional nature of findings and conclusions* . . . . . . . . 5
       *2. The wafer makers and their products* . . . . . . . . . . . . . . . . . . 6
       *3. Larry Tomasiello's employment with Interbake* . . . . . . . . . . 10
       *4. Tomasiello's employment with BoDeansWafer* . . . . . . . . . . 14

*II.* **LEGAL ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
   *A. Standards For Preliminary Injunction* . . . . . . . . . . . . . . . . . . . . . 16
   *B. Conflict of Laws* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
       *1. Iowa's choice-of-law rules in tort cases* . . . . . . . . . . . . . . . 19
       *2. Application of Iowa's choice-of-law rules* . . . . . . . . . . . . . 22
   *C. Application Of The Standards* . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
       *1. Likelihood of success on the merits* . . . . . . . . . . . . . . . . . . 26
          *a. The law governing trade secrets* . . . . . . . . . . . . . 28
          *b. The Iowa Uniform Trade Secrets Act* . . . . . . . . . . . 29

        *c.*      *Is the information in question "trade secrets"?* . . . . . 36

        *d.*      *Is there a likelihood of disclosure by "improper means"?* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    *2.*    *Irreparable harm* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

    *3.*    *Balance of harm* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

    *4.*    *The public interest* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

  *D.*  *The Requirements Of Fed. R. Civ. P. 65(c) & (d)* . . . . . . . . . . . . . . 58

    *1.*    *The scope of a preliminary injunction* . . . . . . . . . . . . . . . . 58

    *2.*    *Fed. R. Civ. P. 65(c)'s security requirement* . . . . . . . . . . . 59

*III. CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

Although the court had not imagined that ice cream sandwich wafers could spawn rivalries more intense than that between vanilla and chocolate, the court has discovered in this "trade secrets" case that rival makers of the "sandwich" wafers of ice cream sandwiches defend their alleged proprietary information with as much zeal as any other entrepreneur seeking to secure an advantage in an increasingly sophisticated and competitive commercial market. Presently before the court is the application of one maker of sandwich wafers for a preliminary injunction seeking to protect its "trade secrets" in wafer manufacturing by enjoining a former employee from disclosing those secrets to, or working for, an upstart wafer manufacturer competitor and the competitor's misappropriation of any of those secrets. Choice of Iowa or Virginia law and a balance of equities will determine what are protectable secrets in this case, whether those secrets should be protected by a preliminary injunction, and what is the proper scope of such an injunction, should the court find that one must issue. Obviously, the decisions that are required to be made by the court in this case are of much greater import and undoubtedly will have more far-reaching ramifications than deciding between vanilla or

chocolate flavored ice cream, and therefore, are decisions that the court does not take light-heartedly.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff, Interbake Foods, L.L.C., (hereinafter "Interbake") filed its complaint in this matter on October 24, 2006, against defendant Larry Tomasiello, the former production manager of Interbake's premier wafer manufacturing facility in Front Royal, Virginia, and defendants BoDeans Baking Company, L.L.C., BoDeans Baking Holding Company, L.L.C., and BoDeans Wafer Company, L.L.C. (hereinafter collectively referred to as "BoDeans")—Tomasiello's current employer (Doc. No. 3). Interbake is a Delaware corporation, with its principal place of business in Front Royal, Virginia. Tomasiello is a citizen of the State of Iowa. He is currently employed at BoDeans and is responsible for overseeing and managing all aspects of the company's wafer production. Defendant BoDeans Baking Holding Company, L.L.C. (hereinafter "BoDeans Baking") is an Iowa corporation with its principal place of business in Le Mars, Iowa. BoDeans Wafer Company, L.L.C. (hereinafter "BoDeans Wafer") and BoDeans Cone Company, L.L.C., (hereinafter "BoDeans Cone") are wholly-owned subsidiaries of BoDeans Baking, and are also Iowa corporations with their principal places of business in Le Mars, Iowa.

Interbake's complaint in this matter is in seven counts, each alleging misconduct under Iowa law following Tomasiello's termination of his employment with Interbake and subsequent employment with BoDeans, which Interbake asserts is trying to become one of its direct competitors by entering into and gaining a significant market share of the wafer manufacturing and distributing industry. Interbake's claims center upon alleged

disclosure by Tomasiello of Interbake's trade secrets and BoDeans's alleged misappropriation of Interbake's trade secrets.[1]

The matter immediately pending before the court is Interbake's motion for a preliminary injunction, filed the same day as Interbake's complaint, seeking to enjoin the defendants' actual or threatened misappropriation of trade secrets. In its motion for a preliminary injunction, Interbake also requested an expedited evidentiary hearing. On October 31, 2006, the court granted the request for an expedited hearing, and scheduled a hearing on the Motion for a Preliminary Injunction for November 8, 2006, in Sioux City,

---

[1]Specifically, Count I of the complaint alleges Tomasiello's breach of a confidentiality agreement by using or disclosing to others, without authorization of Interbake, information relating to the production of ice cream sandwich wafers manufactured and distributed by Interbake. As relief, this count seeks injunctive relief restraining Tomasiello from using or disclosing confidential information or trade secrets in violation of the confidentiality agreement with Interbake and damages. Count II alleges all of the defendants have made an actual misappropriation of Interbake's trade secrets in violation of Iowa Code Ch. 550, the Iowa Uniform Trade Secrets Act. It seeks relief in the form of a preliminary and permanent injunction preventing such misappropriation of trade secrets, damages, and attorneys fees. Count III alleges all of the defendants have made threatened misappropriation of Interbake's trade secrets, based on the inevitable disclosure that will occur simply by operation of Tomasiello's employment with BoDeans. It seeks relief in the form of a preliminary and permanent injunction preventing such threatened misappropriation of trade secrets and attorneys fees. Count IV alleges Tomasiello's breach of a fiduciary duty to maintain the confidentiality of Interbake's trade secrets. Count V alleges tortious interference by BoDeans with the contractual relationship between Tomasiello and Interbake. As relief on this claim, Interbake seeks damages. Count VI alleges that BoDeans and Tomasiello engaged in a civil conspiracy to cause harm to Interbake. The final count of the complaint, Count VII, asserts a claim of conversion on the grounds that BoDeans and Tomasiello wrongfully exercised dominion and control over Interbake's property. This claim seeks as relief the value of the property under the Iowa common law.

Iowa. Thereafter, on November 6, 2006, the defendants' filed their joint resistance to Interbake's Motion for Preliminary Injunction.

This matter proceeded to hearing on Wednesday, November 8, 2006. At the hearing, plaintiff Interbake was represented by counsel Brenton D. Soderstrum of Brown, Winick, Graves, Gross, Baskerville, & Schoenebaum, P.L.C., in Des Moines, Iowa; and Rodney A. Satterwhite and Christopher M. Michalik of McGuire Woods, L.L.P., in Richmond, Virginia. Defendants BoDeans and Tomasiello were represented by Thomas W. Foley of Nyemaster, Goode, West, Hansell & O'Brien, P.C., in Des Moines, Iowa. During the course of the hearing, which extended long into the evenings over the course of two days, in addition to the numerous exhibits presented by the parties, Interbake called three witnesses—Denise Bullock, Vice President and General Manager of Interbake's Front Royal division; Jonathon Fowler, Senior Manager of Electronic Evidence with First Advantage Litigation Consulting; and Terrence Glackin; Senior Manager of Interbake's Research and Development Department. Similarly, the defendants called three witnesses—Dean Jacobsen, the President and CEO of BoDeans; Larry Tomasiello, General Manager of BoDeans Wafer; and Joseph Cardinali, a self-employed engineer of Cardinal Engineering who primarily performs consulting for bakeries, and is currently employed by BoDeans.

## B. Findings Of Fact

### 1. The provisional nature of findings and conclusions

Although the court is disposing of Interbake's Motion for a Preliminary Injunction following briefing by all parties and an evidentiary hearing, it is well to remember that in the context of preliminary injunction applications, the court typically operates under severe time constraints and must customarily decide the motion "on the basis of procedures that

are less formal and evidence that is less complete than in a trial on the merits." *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Thus, the Supreme Court in *University of Texas v. Camenisch* stated the general rule that "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Id.*; *accord Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citing this statement from *Camenisch* as the "general rule" for findings of fact and conclusions of law in preliminary injunction rulings); *United States v. Barnes*, 912 F. Supp. 1187, 1190 (N.D. Iowa 1996) (applying the "general rule" of *Camenisch* to a preliminary injunction ruling on the government's request for a preliminary injunction pursuant to 18 U.S.C. § 1345 to enjoin activities of defendants who were allegedly engaged in mail fraud in violation of 18 U.S.C. § 1341). Any findings of fact in this ruling, made either in this section or in the course of the legal analysis, as well as any conclusions of law forming part of the court's determination of whether the issuance of a preliminary injunction is proper in this case, are intended to be subject to this "general rule" and are not to be considered "final." With this caveat in mind, the court turns to the findings of fact upon which Interbake's Motion for a Preliminary Injunction depends as those facts are established by the documentary evidence and testimony presented at the hearing on November 8-9, 2006.

## 2. *The wafer makers and their products*

Interbake Foods, formerly known as Southern Biscuit Works, was founded in 1899 and is a Delaware corporation with its principal place of business in Front Royal, Virginia. Interbake employs over 3,000 people in nine different locations. It is the third largest cookie/cracker manufacturer in North America. However, in addition to its Front Royal facility, Interbake owns and operates commercial bakery facilities in several locations throughout the United States. Interbake focuses its production on two primary types of

bakery products—cookies and wafers.  The term "wafer" refers to the bread, or sandwich part, of ice cream sandwiches.  Interbake has been successfully manufacturing wafers for over fifty years.  Over the years, Interbake has perfected and refined its processes. Consequently, Interbake's wafer manufacturing process has evolved and currently involves a complicated mixture of precisely measured ingredients; specific standards for cooking timing and temperatures; and specially researched, designed and calibrated machinery. Currently, Interbake manufactures many different flavors and shapes of wafers, has approximately 40 or 50 recipes for wafers and has gained almost a 95% share of the wafer market.  Although many companies have tried to replicate Interbake's success, Interbake represents that it is the only corporation who has developed the processes, formulas and techniques to permit the consistent manufacture of good quality wafers.  Moreover, the court adopts the testimony of Terrence Glackin who represented that the ability to produce a quality "pilot" wafer is substantially different from consistently manufacturing high quality wafers on a mass production scale.  Because of its value, Interbake has guarded, at least somewhat, its trade secrets and confidential information.  For example, the information is not publicly available, and neither does it appear on any Interbake marketing materials, brochures or internet websites.  In addition, Interbake employs other safeguards to maintain the secrecy of this information.  Specifically, at Interbake's Front Royal facility—the only location currently manufacturing wafers[2]—the physical property is protected with security fencing, a single, gated entry point and security guards that are on location twenty-four hours-a-day.  Entry to the actual facility requires secure access card

---

[2]Prior to 2006, Interbake manufactured wafers at production facilities in Elizabeth, New Jersey and Richmond, Virginia.  In 2006, Interbake consolidated all of its wafer manufacturing in its new Front Royal facility.  Interbake closed, or is in the process of closing, the Elizabeth and Richmond facilities.

swipes for employees and specific physical authorization for approved visitors. Cameras monitor the property and all visitors are escorted by Interbake employees at all times. Interbake also limits its access to its computer servers and computers through the employment of stringent computer firewalls. Finally, Interbake requires that all of its salaried employees sign and agree to abide by its Code of Conduct, which specifically includes a duty to not disclose any confidential or proprietary information or other trade secrets. However, the portion of the document addressing confidential information comprises no more than three lines of the seven-page agreement. Interestingly, Interbake does *not* require its hourly employees to sign its Code of Conduct on the theory that these employees only have limited access to confidential and trade secret information. Moreover, no employee is required to sign a covenant not to compete with Interbake.

In contrast, BoDeans is an independent, privately-held and family-owned business that was established in 2001 and is an Iowa corporation with its principle place of business in Le Mars, Iowa. While BoDeans is also a bakery, the company focused primarily on manufacturing ice cream cones up until the year 2003. More specifically, at some point in 1998, Jacobsen, founder and current President and CEO of BoDeans, became aware of the fact that Interbake, through its acquisition of different companies, had captured over 95% of the market for novelty ice cream cones. Jacobsen saw an opportunity to take advantage of this dearth of competition and decided to enter the cone market. Jacobsen's endeavor was a success and the BoDeans family was born. BoDeans boasts the most modern cone baking facility in North America. In 2006, BoDeans Cone Company will produce just under 500,000,000 cones, which represents approximately 50% of the market. Since its inception, BoDeans Cone has grown on an annual basis by 500% per year—making it one of the fastest growing companies in North America. With respect to cones, Wells' Dairy, Inc., the world's largest family-owned and managed dairy processor,

also located in Le Mars, Iowa, is and has been, one of BoDeans's major cone purchasers. After BoDeans Cone established itself successfully in the novelty cone market, in March of 2003, Wells' Dairy, obviously satisfied with BoDeans's cone products, approached Jacobsen and encouraged him to expand BoDeans's business into the wafer market. Jacobsen, spurred on not only by his success in the cone market but also by his realization that Interbake, at that time, also held a 95% share of the wafer market, incorporated BoDeans Wafer and entered into negotiations with Wells' Dairy. Following negotiations, a Letter of Agreement was entered into between Wells' Dairy and BoDeans Wafer on November 14, 2003. Under the terms of the Letter of Agreement, BoDeans Wafer agreed to develop a pilot scale wafer baking process capable of producing wafers that met Wells' Dairy's specifications. If and when the pilot process was perfected, Wells' Dairy would then purchase substantially all of its wafers from BoDeans Wafer and BoDeans Wafer would construct a full-scale production facility. The pilot process BoDeans Wafer created was essentially a small replica of the full-scale baking process BoDeans Wafer would later develop. BoDeans spent over $450,000 on the pilot machine and another $150,000 to retrofit the cone baking facility for this operation. Throughout 2004 and into 2005, with the assistance of several independent consultants, BoDeans Wafer engaged in an extensive research and development effort to design a production process that would produce wafers. As part of that effort, numerous recipes, baking methods, and production methodologies were tried. Ultimately, a production system was created from scratch. Wells' Dairy approved the wafers BoDeans produced with its pilot process and the companies entered into a formal Supply Agreement on February 21, 2005—long before the process of hiring Tomasiello began. Pursuant to the Supply Agreement, BoDeans receives an increase in compensation for the implementation of any procedures that save Wells' Dairy money. In May 2005, construction began on a new production facility. All told, BoDeans invested

approximately $5.5 million in machinery and equipment and another $5.6 million on the construction of the commercial production facility. Construction of the wafer facility was completed in February 2006.

Initially, BoDeans hired a General Manager to lead BoDeans Wafer who had significant experience in the baking industry. However, it soon became apparent to Jacobsen that his initial hire lacked the leadership and professional skills necessary to effectively manage BoDeans's current operations. Based on that realization, Jacobsen directed BoDeans's Human Resource Manager to contact Barbara Schaffer of Management Recruiters of Portland, Oregon and ask her to begin work on a confidential search for a replacement. Jacobsen informed Schaffer that his top three hiring criteria were leadership skills, management skills and general knowledge of the baking industry. In addition, Schaffer was told to take a look at Interbake employees, based on the information that Interbake had consolidated its plants into one facility in Front Royal and that some of Interbake's employees had been left unemployed. Schaffer agreed to conduct the search on BoDeans's behalf. Ultimately, she provided Jacobsen with a handful of names, one of which was Tomasiello's, Interbake's Front Royal Production Manager, who eventually began to work for BoDeans on October 16, 2006.

### 3.    Larry Tomasiello's employment with Interbake

Larry Tomasiello began working at Interbake as a shift manager over the wafer production line eight years ago at Interbake's Elizabeth, New Jersey facility.[3]    Although

---

[3]Prior to working for Interbake, Tomasiello was employed at Sunshine Biscuits. Sunshine Biscuits primarily manufactured cookies and crackers. At Sunshine Biscuits, Tomasiello was promoted through the ranks from a line worker to a Production Department Superintendent. Sunshine Biscuits was acquired by Keebler in 1996, and ultimately Tomasiello was laid off in addition to a number of other employees. Tomasiello

(continued…)

that facility produced both cookies and wafers, Tomasiello continued to work in wafer production throughout his tenure at Interbake. Because he was a salaried employee, Tomasiello was required to sign Interbake's Code of Conduct, and among other things, agreed to protect "confidential and proprietary information from unauthorized disclosure and use." He further agreed not to use "confidential information or trade secrets gained by virtue of [his] employment . . . for personal gain or any purpose other than the performance . . . of his . . . duties." Finally, Tomasiello agreed that if he left the service of Interbake, for any reason, that the "confidential and proprietary information remain[ed] with and [would be] the exclusive property of the Company" and that such information was not to be used nor disclosed in any way by [him] following the termination date of his . . . . employment with the Company." Tomasiello worked at the Elizabeth facility until the fall of 2005. During his tenure there, Tomasiello rose to the level of Business Manager over the Elizabeth facility's wafer manufacturing process. As such, he oversaw and was responsible for all aspects of the Elizabeth facility's wafer manufacturing. Throughout his employ with Interbake, Interbake provided him with access to all of its wafer formulas and production processes and techniques. More specifically, Tomasiello knew the precise combination of ingredients, the proper settings for the machinery and the time and temperature parameters that were necessary to produce superior ice cream sandwich wafers.

At some point, during the fall of 2005, Interbake consolidated all of its wafer manufacturing into a new facility in Front Royal, Virginia. Consequently, Interbake closed both its Elizabeth facility and its facility in Richmond and transferred all production

---

[3](...continued)
was hired by Interbake for his bakery supervision experience and not for any preexisting wafer knowledge he may have had.

of wafers to the new facility in Front Royal. As a result of the transition, a Production Manager position became available at the Front Royal facility. The Front Royal Production Manager position was essentially designed to be responsible for all aspects of wafer production at the facility. In order to be effective at this position, the Production Manager obviously would be required to become intimately familiar with all aspects of Interbake's wafer manufacturing process. Because Tomasiello was already familiar with Interbake's wafer production formulas, processes and techniques, he was selected as the new Front Royal Production Manager in 2005. In addition to overseeing the day-to-day operations of the facility, Tomasiello supervised start-up projects with respect to wafer manufacturing and adapted the wafer manufacturing processes to the facility's new production environment. He not only continued to work with Interbake's existing production processes, but he also observed how to adapt those processes. As a result, Tomasiello learned how to "tweak," or alter formulas, ingredients, processes and techniques to a new production site and new machines. Tomasiello was heavily involved in the start-up process and in doing so, gained even greater and more detailed knowledge of Interbake's trade secrets, especially as they applied to operating and creating a new, functional production facility. Unfortunately, however, Tomasiello was given the impression by his supervisor that his promotion potential was capped at his current level. To no one's surprise, then, Tomasiello expressed interest when he received a call from Jacobsen about a new opportunity with BoDeans.

On or about August 22, 2006, Jacobsen, telephoned Tomasiello in an attempt to find out if Tomasiello would be interested in the prospect of leaving Interbake. Thereafter, on September 21-22, 2006, Tomasiello flew to Le Mars, Iowa, for an in-person interview. Not surprisingly, Jacobsen, who was shocked someone in Tomasiello's position would be interested in coming to Le Mars, Iowa, to become part of a fledgling operation, did not

allow Tomasiello to view BoDeans's wafer plant at that time. However, Tomasiello was allowed to see BoDeans's cone facility. Tomasiello and his spouse flew to Le Mars, Iowa, on September 29, 2006, where he was finally allowed to tour the wafer plant, and the possibility of an employment relationship between Tomasiello and BoDeans was discussed. When Tomasiello left, he took with him a proposed equity agreement that he had his lawyer review on October 2, 2006. Tomasiello also expected to receive a formal written offer after he and his spouse left Le Mars on September 29, 2006. On October 5, 2006, Jacobson faxed Tomasiello a written offer of employment as BoDeans's General Manager. This offer included a one-year covenant not to compete. BoDeans had originally asked for a two-year term of non-competition but agreed to a one-year term during negotiations with Tomasiello. Tomasiello accepted Jacobsen's offer on that same day.

During approximately the same time period, on the evenings of October 4 and October 5, 2006, Tomasiello accessed numerous computer files contained on Interbake's system. Many of these files contained highly sensitive wafer production information. More specifically, Tomasiello accessed files containing sensitive information about the Front Royal facility's run speeds, Interbake wafer oven temperatures and settings, and an important Designed Experiment, which essentially was a study conducted, at significant expense to Interbake, by DuPont to study the various factors that contributed to wafer breakage—a major obstacle to the consistent manufacture of wafers. Although there was no direct evidence the documents were printed, the court adopts Interbake's expert's testimony, who stated that this occurrence is not out-of-the-ordinary because the temporary print files associated with a local printer are often overridden by normal usage of the machine. The court further adopts, however, Interbake's expert's testimony that there was no record the documents were downloaded or copied and that evidence would have been available, if it indeed, had happened.

After accessing these files, Tomasiello reported to work two days later on the morning of October 6, 2006, and informed Interbake that he would be resigning his employment and gave two-weeks notice. Upon learning of Tomasiello's impending resignation, Interbake's Vice President and General Manager of the Front Royal facility, Denise Bullock, asked Tomasiello if there was anything Interbake could do to change his mind. Tomasiello responded in the negative. Bullock then terminated Tomasiello's employment, had him escorted to his office to retrieve his personal effects and had him escorted to his car. Bullock also reminded Tomasiello not to disclose Interbake's confidential or proprietary information or other trade secrets. Tomasiello replied he was not taking anything with him except "what was in [his] head."

### 4.    Tomasiello's employment with BoDeans Wafer

Tomasiello begain working with BoDeans on or about October 16, 2006, as BoDeans's General Manager. As he was at Interbake, Tomasiello is responsible for the oversight of all aspects of BoDeans's wafer production. In addition to Tomasiello, BoDeans Wafer has additional management, none of whom had pre-existing wafer experience. Tomasiello receives a cash incentive based on BoDeans's overall performance margin. Following Tomasiello's resignation, on Monday, October 9, 2006, the first work day after Tomasiello announced his resignation, Wells' Dairy, one of Interbake's largest customers, informed Interbake that it would not be placing future wafer orders with Interbake after December 31, 2006. The timing of this decision initially appeared suspicious to both Interbake and the court. However, the evidence presented at the preliminary injunction hearing conclusively established that Wells' Dairy made the decision to switch their wafer supplier from Interbake to BoDeans long before BoDeans contacted Tomasiello about employment with them. Instead, Wells' Dairy indicated that in 2007,

it would be placing its wafer orders with BoDeans.[4]  Jacobsen indicated in his testimony that at this time, Tomasiello has not disclosed a "shred" of confidential information. Although the court accepts this testimony at its face value, the court nonetheless finds that Interbake has reason to be concerned about disclosure of its trade secrets and confidential information as the result of Tomasiello's employment with BoDeans.  The reasons for that conclusion are discussed below, following the court's examination of the standards for determining whether Interbake has shown a threat of irreparable harm from Tomasiello's employment with BoDeans.

With this factual background in mind, recognizing that it at best provides the court with a provisional record upon which to base decisions of some significance to the parties, the court turns to the legal analysis of Interbake's motion to enjoin disclosure and misappropriation of trade secrets and improper employment of a former employee with a competitor.  With the proper legal framework in mind, the court will return to some of the necessary factual determinations it must make in order to resolve the question of whether a preliminary injunction should issue in this case.

---

[4] BoDeans brought to the preliminary injunction hearing samples of its ice cream sandwich wafers that Wells' Dairy is switching to, as well as samples of Interbake's wafers.  As a life-long consumer of, arguably, too many ice cream sandwiches, the court can understand why Wells' Dairy and it's consumer panels prefer the BoDeans product . It has a much richer chocolate flavor and superior taste.

## II. LEGAL ANALYSIS

### A. Standards For Preliminary Injunction

As this court explained in past cases, it is well-settled in this circuit that applications for preliminary injunctions and temporary restraining orders[5] are generally measured against the standards set forth in the seminal *Dataphase Systems, Inc. v. C L Systems, Inc.,* 640 F.2d 109, 113 (8th Cir. 1981) (en banc), decision. *See Doctor John's, Inc. v. City of Sioux City, Iowa,* 305 F. Supp. 2d 1022, 1033-34 (N.D. Iowa 2004); *Branstad v. Glickman,* 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000); *Uncle B's Bakery, Inc. v. O'Rourke,* 920 F. Supp. 1405, 1411 (N.D. Iowa 1996). These factors include (1) the movant's probability of success on the merits, (2) the threat of irreparable harm to the movant absent the injunction, (3) the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties, and (4) the public interest. *Dataphase,* 640 F.2d at 114; *accord Doctor John's, Inc.,* 305 F. Supp. 2d at 1033; *Branstad,* 118 F. Supp. 2d at 937 (quoting similar factors from *Entergy, Ark., Inc. v. Nebraska,* 210 F.3d 887, 898 (8th Cir. 2000)); *Fed. R. Civ. P.* 65(b)(1). The burden of establishing the propriety of a preliminary injunction is on the movant. *Baker Elec. Co-op., Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994); *Modern Computer Sys., Inc., v. Modern Banking Sys., Inc.*, 871 F.2d 734, 737 (8th Cir. 1989) (*en banc*). "'No single

___

[5] In *Branstad v. Glickman,* 118 F. Supp. 2d 925, 937 (N.D. Iowa 2000), this court also discussed in some detail the differences between a temporary restraining order and a preliminary injunction. *See Branstad,* 118 F. Supp. 2d at 935-937. Suffice it to say that, in that case, the court found the following factors should be considered to distinguish a TRO from a preliminary injunction: (1) whether the hearing was *ex parte* or adversarial; (2) whether the adversarial hearing allowed the basis for the relief requested to be strongly challenged; (3) whether the order expired, by its own terms, within the ten days provided by Rule 65(b); and (4) the "substance" of the order. *Id.*

[*Dataphase*] factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance they weigh towards granting the injunction.'" *Baker Elec. Co-op.*, 28 F.3d at 1472 (quoting *Calvin Klein Cosmetics Corp. v. Lenox Labs., Inc.*, 815 F.2d 500, 503 (8th Cir. 1987) (citing *Dataphase*)).

Although the *Dataphase* standards are *generally* applicable to motions for preliminary injunctions in civil cases in this circuit, the court cannot pass on without comment on another candidate for articulation of the applicable standards—Iowa law. First, in a diversity, action, the federal court is not free to fashion rules of law from whole cloth. *Jackson v. Anchor Packing Co.*, 994 F.2d 1295, 1310 (8th Cir. 1993). In other diversity actions involving efforts by former employers to enjoin misappropriation of trade secrets by former employees, this court has considered whether the *Erie* doctrine, requiring application of state law to substantive questions in diversity cases, required application of state or federal standards to issuance of a preliminary injunction. *See, e.g., Uncle B's Bakery, Inc.,* 920 F. Supp. at 1422-23; *see also Curtis 1000, Inc. v. Youngblade,* 878 F. Supp. 1224, 1243-44 (N.D. Iowa 1995) (addressing whether *Erie* doctrine required application of state law albeit in the context of enjoining a former employee from violating a covenant not to compete). In both instances, the court concluded that it should apply federal rather than Iowa law to the determination of whether a preliminary injunction should issue in the case, because, the court found, federal courts are to apply their own rules of civil procedure, including Rule 65, which incorporates traditional federal equity practice for the issuance of preliminary injunctions. *Uncle B's,* 920 F. Supp. at 1422-23; *Curtis 1000,* 878 F. Supp. at 1244. In the case at bar, the parties have not raised the question of whether state or federal law applies to the issuance of a preliminary injunction. In light of this fact, and the fact that this court has decided the same question in prior decisions and finds no ground to abandon those decisions, this

court shall again look to the federal standards, rather than state standards, to determine if a preliminary injunction should issue in this instance. Moreover, as was the case in *Uncle B's* and *Curtis 1000,* the court concludes further that, as a practical matter, it is highly unlikely that application of federal rather than Iowa law to the question before the court would be "outcome determinative," as Iowa courts apply roughly the same tests as do federal courts of this circuit to issuance of a preliminary injunction, although the Iowa standard may in fact be more lenient. *Uncle B's,* 920 F. Supp. at 1422-23; *Curtis 1000,* 878 F. Supp. at 1244; *accord PIC USA v. N.C. Farm P'ship,* 672 N.W.2d 718, 723 (Iowa 2003) (noting that under Iowa law the standards for granting temporary injunctions are similar to those for permanent injunctions); *Max 100 L.C. v. Iowa Realty Co., Inc.,* 621 N.W.2d 178, 180 (Iowa 2001) (discussing, under Iowa law, the standards governing issuance of temporary injunctions); *Emma Goldman Clinic v. Holman,* No. 04-0678, 2005 WL 974759 at *1-2 (Iowa Ct. App. Apr. 28, 2005) (discussing, briefly, temporary and permanent injunctive relief). Accordingly, the court will again apply the factors enunciated in *Dataphase* with respect to the merits of the current motion.

"'A district court has broad discretion when ruling on requests for preliminary injunctions, and [the appellate court] will reverse only for clearly erroneous factual determinations, an error of law, or an abuse of that discretion.'" *Entergy, Ark., Inc.,* 210 F.3d at 898 (quoting *United Indus. Corp. v. Clorox Co.,* 140 F.3d 1175, 1179 (8th Cir. 1998)). As the Eighth Circuit Court of Appeals has also explained,

> These factors are not a rigid formula. However, "[t]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Beacon Theaters, Inc. v. Westover,* 359 U.S. 500, 506-07 (1959). Thus, to warrant a preliminary injunction, the moving party must demonstrate a sufficient threat of irreparable harm. *See*

> *Adam-Mellang v. Apartment Search, Inc.,* 96 F.3d 297, 299
> (8th Cir. 1996).

*Bandag, Inc. v. Jack's Tire & Oil, Inc.,* 190 F.3d 924, 926 (8th Cir. 1999); *see Baker Elec. Co-op.,* 28 F.3d at 1472 ("No single factor in itself is dispositive; in each case all of the factors must be considered to determine whether on balance, they weigh towards granting the injunction. However, a party moving for a preliminary injunction is required to show the threat of irreparable harm.") (internal quotation marks and citations omitted).

## B. Conflict of Laws

Before embarking on a consideration of the *Dataphase* factors, the court must first resolve which state's standards should be used to determine the validity and enforceability of the alleged trade secrets in question here—the standards of Iowa, where Tomasiello is currently employed and where the alleged misappropriation occurred, or the standards of Virginia, where Interbake is domiciled.

### 1. Iowa's choice-of-law rules in tort cases

The court has confronted the often knotty problem of what law applies to specific common-law and statutory claims in a diversity action a number of times in recent years. *See Jones ex rel. Jones v. Winnebago Indus. Inc.,* ___ F. Supp. 2d ___, No. C05-3042-MWB, 2006 WL 3095946, at*7-15 (N.D. Iowa Nov. 1, 2006); *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F. Supp. 1445, 1458 (N.D. Iowa 1996); *Harlan Feeders, Inc. v. Grand Labs., Inc.,* 881 F. Supp. 1400 (N.D. Iowa 1995); *Curtis 1000,* 878 F. Supp. at 1251-54. To resolve the issue of which state's law applies to Interbake's claims, the court looks to the conflict-of-laws or choice-of-law rules of the state of Iowa, because in an action based upon diversity of citizenship jurisdiction, a federal district court must apply the substantive law of the state in which it sits, including its conflict-of-laws

or choice-of-law rules. *Harlan Feeders, Inc.*, 881 F. Supp. at 1403-04 (citing, *inter alia,* *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)); *accord Colonial Ins. Co. of Cal. v. Spirco Envtl., Inc.*, 137 F.3d 560, 561-62 (8th Cir. 1998) ("' Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is based on diversity of citizenship.'") (quoting *Whirlpool Corp. v. Ritter*, 929 F.2d 1318, 1320 (8th Cir. 1991)); *Penney v. Praxair, Inc.*, 116 F.3d 330, 333 n. 4 (8th Cir. 1997) ("Sitting in diversity, a district court is bound to apply the choice of law rules of the state in which it sits . . . .").

However, before any choice of law need be made, there must be a "true conflict" between the laws of the possible jurisdictions on the pertinent issue. *Id.* at 1404; *accord Phillips v. Marist Soc'y of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (agreeing with the statement of Judge Richard A. Posner that "'before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states.' *Barron v. Ford Motor Co. of Canada, Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992), *cert. denied,* 506 U.S. 1001, 113 S. Ct. 605, 121 L. Ed. 2d 541 (1992)," and simply applying the law of the forum where there was no true conflict). Here, however, significant differences exist between the two states' Uniform Trade Secrets Acts so as to qualify as a "true conflict." For example, the Virginia Uniform Trade Secrets Act differs from Iowa's Uniform Trade Secret Act because the Virginia Act preempts almost all common law claims that are based on alleged trade secret misappropriation. *See Va. Code* § 59.1-341; *see also Smithfield Ham & Prods. Co. v. Portion Pac, Inc.*, 905 F. Supp. 346, 348 (E.D. Va. 1995). In order to avoid preemption under Virginia law, a common law claim must be supported by facts unrelated to the misappropriation of a trade secret. *Id.* at 348-49. In addition, Interbake must be able to prove that it could lose its misappropriation of trade secret claim under the Virginia

Uniform Trade Secrets Act and yet still recover on its other theories of liability. *Id.*
Iowa's Uniform Trade Secrets Act does not preempt common-law claims. Moreover, and
perhaps more imperative to the claims at issue in this case, there is a conflict with respect
to the applicability and enforceability of the inevitable disclosure doctrine. Although the
Iowa Supreme Court has not affirmatively ruled on the viability of such a doctrine in Iowa,
at least one federal court in Iowa has determined that the Iowa Trade Secrets Act provides
protection from the inevitable disclosure of trade secrets. *See generally Barilla Am., Inc.
v. Wright*, No. 4-02-CV-90267, 2002 WL 31165069 (S.D. Iowa July 5, 2005). In stark
contrast, however, at least one Virginia court has concluded that the Virginia Uniform
Trade Secrets Act does not recognize such a theory of liability. *Gov't Tech. Servs., Inc.
v. Intellisys Tech. Corp.*, 1999 WL 1499548 (Va. Cir. Oct. 20, 1999). These differences
are sufficient to warrant a colloquy with respect to which state's law should be applied in
this case.

The first step in determining the actual choice-of-law is to determine the proper
characterization of what kind of claim is involved, and the law of the forum controls this
question as well. *Id.* at 1404. As this court observed in *Harlan Feeders*:

> Iowa applies the "most significant relationship test" to conflict-
> of-laws or choice-of-law questions involving either contract or
> tort claims. *See Christie v. Rolscreen Co.*, 448 N.W.2d 447,
> 450 (Iowa 1989) (recognizing that the "most significant
> relationship" test applies to tort causes of action) (citing *Zeman
> v. Canton State Bank*, 211 N.W.2d 346, 349 (Iowa 1973));
> *Cameron v. Hardisty*, 407 N.W.2d 595, 597 (Iowa 1987)
> (tort); *Cole v. State Auto. & Cas. Underwriters*, 296 N.W.2d
> 779, 781 (Iowa 1980) (contract); *Zeman*, 211 N.W.2d at 349
> (tort issue); *Lindstrom v. Aetna Life Ins. Co.*, 203 N.W.2d 623
> (Iowa 1973) (contract issue); *Berghammer v. Smith*, 185
> N.W.2d 226 (Iowa 1971) (tort issue); *In re Marriage of
> Whelchel*, 476 N.W.2d 104, 109 (Iowa Ct.App.1991) (in

marital property case, the court noted that "[i]n other areas of the law, Iowa has adopted, as choice-of-law doctrine, the 'most significant relationship' rule espoused by the *Restatement (Second) of Conflict of Laws*," citing *Lindstrom* and *Berghammer*); *see also Drinkall* [*v. Used Car Rentals, Inc.*], 32 F.3d [329,] 331 [(Iowa 1994)] (citing *Cameron*, 407 N.W.2d at 597 (tort), and *Cole*, 296 N.W.2d at 781 (contract)); [*Smith v.*] *Gould, Inc.*, 918 F.2d [1361,] 1363 n.3 [(8th Cir. 1990)] (citing *Cole* (contract), and *Zeman* (tort)). However, the factors the court is to consider are not identical in the context of torts and contracts . . . .

*Harlan Feeders*, 881 F. Supp. at 1405. At issue in Interbake's motion are primarily tort claims-misappropriation and conversion claims. Thus, the court turns to the application of appropriate factors for tort claims under Iowa's "most significant relationship" test.

For tort claims, the Iowa Supreme Court has stated that "[c]onsiderations [in the most significant relationship test] include: place of injury, place of conduct leading to the injury, domicile of the parties, and the place where any relationship between the parties is centered. *Harlan Feeders*, 881 F. Supp. at 1409 (quoting *Zeman*, 211 N.W.2d at 349; *see also Christie*, 448 N.W.2d at 450 (quoting *Zeman*)). These are also the factors listed in Restatement (Second) of Conflict of Laws § 145(2), which the Iowa Supreme Court has adopted. *Cameron*, 407 N.W.2d at 597; *accord Veasley v. CRST Int'l, Inc.*, 553 N.W.2d 896, 897-98 (Iowa 1996). However, this court has noted that the first factor, place of injury, now receives only "limited weight." *Harlan Feeders*, 881 F. Supp. at 1409.

## 2. *Application of Iowa's choice-of-law rules*

With respect to this first factor, the Restatement further qualifies this rule, stating:

Situations do arise, however, where the place of injury will not play an important role in the selection of the state of applicable law. . . . This will . . . be so when . . . there may be little reason in logic or persuasiveness to say that one state rather

22

> than another is the place of injury, or when . . . injury has
> occurred in two or more states.

*Restatement (Second) of Conflicts of Laws* § 145 cmt. f.  The Restatement further states that "the place of injury is less significant in the case of . . . unfair competition . . . and the misappropriation of trade values." *Id.*  The Restatement's explanation for the unimportance of the place of injury in cases of misappropriation of trade values is directly applicable here:

> The injury suffered through false advertising is the loss of
> customers or of trade. Such customers or trade will frequently
> be lost in two or more states.  The effect of the loss, which is
> pecuniary in its nature, will normally be felt most severely at
> the plaintiff's headquarters or principal place of business. But
> this place may have only a slight relationship to the
> defendant's activities and to the plaintiff's loss of customers or
> trade.    The situation is essentially the same when
> misappropriation of the plaintiff's trade values is involved,
> except that the plaintiff may have suffered no pecuniary loss
> but the defendant rather may have obtained an unfair profit.

*Id.*  Equally applicable here is the conclusion that in such cases, "the place of injury does not play so important a role for choice-of-law purposes . . . as in the case of other kinds of torts[ and that i]nstead, the principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise." *Id.*  Thus, in the case at bar, the "place of injury," at least in one aspect, is arguably the state of Virginia as that is where Interbake's principal place of business is located.  However, the place of injury could also be construed as the state of Iowa because that is where the allegedly injurious misappropriations took place.  *See Dethmers Mfg. Co. v. Automatic Equip. Mfg. Co.*, 23 F. Supp. 2d 974, 1004-05 (N.D. Iowa 1998) (discussing the "place of injury" factor).  However, this factor does not appear to weigh in favor of either state's law.  Moreover,

even assuming this factor weighed more heavily in favor of Virginia law as alleged by the defendants, as mentioned previously, this factor, though significant, does not weigh as heavily in the court's interest analysis as other factors and is not dispositive in this case. *See id.* (noting the place of injury was not decisive in the court's choice of law analysis).

Turning to the next factor, although the effect of Interbake's loss may have been felt in Virginia, where its principal place of business is located, defendant BoDeans allegedly obtained an unfair profit in Iowa. Further, although the *effects* of the injury arguably may have been felt the greatest in Virginia, the vast majority of the allegedly improper conduct occurred or is threatened to occur in Iowa at BoDeans's Le Mars facility. Although the defendants argue that the allegedly improper conduct occurred in both Virginia and Iowa, based on the fact that Tomasiello acquired the allegedly protected information in Virginia, this court disagrees. The defendants contend that Tomasiello's procurement of Interbake's trade secrets was improper and that this improper acquisition occurred in Virginia. However, Tomasiello properly was privy to Interbake's trade secrets and it does not appear that Tomasiello improperly obtained any trade secrets, i.e. obtained secrets he would not have had access to by virtue of his position at Interbake. *Contra Flavorchem Corp. V. Mission Flavors & Fragrances, Inc.*, 939 F. Supp. 593, 595 (N.D. Ill. 1996) (finding that location of the tort occurred in separate states in a case where a former employee illegally copied certain flavor formulas from the plaintiff and then used the formulas to start his own business in a different state). Moreover, even if Tomasiello's conduct was improper, the importance of this one fact is outweighed, clearly, by the numerous allegations of tortious conduct that took place in Iowa. Thus, the court concludes that the vast majority of defendants' alleged tortious conduct occurred in Iowa, not Virginia.

The third factor, the domicile of the parties also weighs in favor of application of Iowa law. The BoDeans defendants are Iowa corporations with their principal places of

business located in Le Mars, Iowa. Larry Tomasiello is also domiciled in Iowa. Only the plaintiff, Interbake, is located outside of Iowa as a Delaware Corporation with its principal place of business in Virginia. On balance, this factor weighs in favor of Iowa law. In addition, the court notes that the defendants' domicile is particularly important in this case because it is the location where the information was allegedly used or the benefit of the use by the defendant was allegedly enjoyed. Moreover, a special emphasis on this contact makes sense in light of Iowa's strong interest in restricting the intentional tortious acts of its own citizens and in protecting its citizens from future wrongs by these same bad actors. *C.f. Fleet Mgmt. Sys., Inc. v. Archer-Daniels-Midland Co.*, 627 F. Supp. 550, 564 (C.D. Ill. 1986). While the defendants point out that Virginia has an important interest in ensuring adequate compensation for corporations within its borders, the court finds that this interest is adequately protected by Iowa's interest in remedying and preventing deceptive business practices. *Id.*

Finally, the last contact to be considered in the court's interest analysis is the place where the relationship between the parties is centered. In the instant case, this factor does not appear to favor either Virginia or Iowa. Although Tomasiello worked for Interbake in Virginia, he later worked for BoDeans in Iowa. The record suggests that the parties' relationship was equally based in both states. Thus, because Iowa has the most significant contact to (and thus, the greatest interest in) this case, the court holds that Iowa law governs all of the plaintiff's statutory and common law claims related to the defendants' alleged misappropriation of Interbake's trade secrets and confidential information. This conclusion is bolstered by the Restatement. For example, the Restatement provides the following illustration: "Likewise, when a person in State X writes a letter about the plaintiff which is received in state Y, the local law of Y, the state where the publication occurred, will govern most issues in tort . . . ." Thus, as this illustration makes clear, the

law of the state where the alleged wrong was committed generally applies, not the place where the injury is felt, i.e., the place of plaintiff's domicile. *See Flavorchem Corp.*, 939 F. Supp. at 597 ("Generally, courts have held that the location of a defendant's business is the place where the alleged wrong was committed because that is where the information was used and the benefit obtained by the defendant."). Accordingly, the court will apply Iowa law to the plaintiff's claims.

### C. Application Of The Standards

The court will consider Interbake's Motion for a Preliminary Injunction in light of each of the *Dataphase* factors in turn, to determine whether these factors weigh in favor of enjoining, to some extent, the conduct of either Tomasiello or BoDeans. The court reserves, for further consideration below, the question of the extent of the scope of any injunctive relief, should the court first determine that issuance of a preliminary injunction is appropriate.

### 1. Likelihood of success on the merits

The first factor considered by the courts under *Dataphase* when ruling on an application for a TRO or preliminary injunction is the likelihood or probability of success on the merits. *Pottgen v. Mo. State High Sch. Activities Ass'n*, 40 F.3d 926, 929 (8th Cir. 1994). When considering this factor, the court is not deciding whether the movant for a preliminary injunction will ultimately win. *Glenwood Bridge, Inc. v. City of Minneapolis*, 940 F.2d 367, 371 (8th Cir. 1991); *O'Connor v. Peru State Coll.*, 728 F.2d 1001, 1002 (8th Cir. 1984) (in such preliminary proceedings, "the court should avoid deciding with any degree of certainty who will succeed or not succeed."). In isolation, the likelihood of success on the merits is meaningless. *Glenwood Bridge*, 940 F.2d at 371 (quoting

similar language in *Dataphase*). Therefore, the court must consider other factors, especially the threat of irreparable harm. *Id.*

In order to weigh in the movant's favor, the movant's success on the merits must be "at least . . . sufficiently likely to support the kind of relief it requests."[6] *Sanborn Mfg. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 488 (8th Cir. 1993) (action under

---

[6]Another circuit court of appeals has described the meaning of likelihood of success on the merits and its interplay with the balance of harms as follows:

> What is true is that if the party seeking the preliminary injunction would suffer more harm from the denial of it than his opponent would suffer from its being granted, the injunction should be granted even if the party seeking it has no more than a 50-50 chance of winning, and even, in some cases, if the odds are worse. If for example the party seeking the injunction would lose $10,000 if it was denied, and has a 40 percent chance of being in the right, and the other party would lose only $1,000 if the injunction is granted and has (necessarily) a 60 percent chance of being in the right, then the cost of denial of the injunction to the party seeking it, when discounted by the probability that he is in the right, would exceed the cost of granting the injunction to the other party, when discounted by the probability of his being in the right. (That is, $4,000 ($10,000 x .40) is greater than $600 ($1,000 x .60).). *E.g., Green River Bottling Co. v. Green River Corp.*, 997 F.2d 359, 361 (7th Cir. 1993); *Curtis v. Thompson,* 840 F.2d 1291, 1296 (7th Cir. 1988). But if as in this case the judge, having obtained in the preliminary hearing all the facts that [the judge] believes pertinent to deciding which party is in the right, is able to make up [his or her] mind that the party seeking the injunction has no legal ground for his case, [the judge] should not only deny the injunction, [he or she] should dismiss the suit; for [the judge] knows how it will come out.

*Curtis 1000, Inc. v. Suess*, 24 F.3d 941, 945 (7th Cir. 1994).

the Lanham Act in which the court concluded that either result argued by the opposing parties was directly supported by the evidence presented). Thus, likelihood of success on the merits requires that the movant find support for its position in governing law. *See, e.g., Baker Elec. Co-op.*, 28 F.3d at 1473-74 (Indian tribe's sovereignty to regulate electrical services); *ILQ Inv., Inc. v. City of Rochester*, 25 F.3d 1413, 1416 (8th Cir. 1994) (first amendment and prior restraint of expression); *City of Timber Lake v. Cheyenne River Sioux Tribe*, 10 F.3d 554, 556-58 (8th Cir. 1993) (Indian tribe's regulatory authority and authority of states to regulate activities on tribal lands); *Aziz v. Moore*, 8 F.3d 13, 15 (8th Cir. 1993) (denial of injunctive relief proper because federal courts "must abstain from imposing injunctions on prison officials [in an action under 42 U.S.C. § 1983 action] 'in the absence of a concrete showing of a valid claim and constitutionally mandated directives for relief,'" quoting *Rogers v. Scurr*, 676 F.2d 1211, 1214 (8th Cir. 1982)). The court, therefore, must consider what law governs Interbake's claims concerning misappropriation of trade secrets.

### a.     *The law governing trade secrets*

In this diversity action, the substantive law governing Interbake's trade secrets claim is Iowa law. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938); *Austin v. Super Valu Stores, Inc.*, 31 F.3d 615, 618 (8th Cir. 1994) (citing *Erie*); *Jackson*, 994 F.2d at 1310 (in a diversity action, the federal court is not free to fashion rules of law from whole cloth, but is instead bound to apply the law of the state in which it sits as far as it is able to discern it from the rulings of the state's courts). The court finds that protection of trade secrets is a matter of Iowa statutory and common law. *See 205 Corp. v. Brandow*, 517 N.W.2d 548, 551 (Iowa 1994) (holding that by omitting a section of the uniform act, which would have specifically displaced all other trade secret recoveries, at the time the act was adopted by the Iowa legislature, "Chapter 550 has not preempted all tort theories

involving trade secrets," although duplicative recoveries would not be allowed; therefore, the court allowed claims of both misappropriation of trade secrets and inducement to breach a duty not to disclose confidential information); *see also Diversified Fastening Sys., Inc. v. Rogge*, 786 F. Supp. 1486, 1490-91 (N.D. Iowa 1991) (considering a statutory claim under Chapter 550 and a common-law breach of fiduciary duty not to disclose confidential information claim as alternative bases for granting a preliminary injunction to prevent disclosure of trade secrets).

### b.    The Iowa Uniform Trade Secrets Act

The Iowa legislature passed the Iowa Uniform Trade Secrets Act, Iowa Code Ch. 550, in 1990, and amended that act in 1991. *See* Iowa Acts 1990 (73 G.A.) ch. 1201; Iowa Acts 1991 (74 G.A.) ch. 35; *see also Diversified Fastening Sys.*, 786 F. Supp. at 1491 (Iowa Code Chapter 550 was adopted in April of 1990). The Iowa Supreme Court has previously discussed the essential features of the Trade Secrets Act in *Economy Roofing & Insulating Co. v. Zumaris*, 538 N.W.2d 641 (Iowa 1995):

> Iowa Code section 550.3(1) (1991) provides that "[t]he owner of a trade secret may petition the district court to enjoin an actual or threatened misappropriation." Iowa Code section 550.4(1) provides that "an owner of a trade secret is entitled to recover damages for the misappropriation."
>
> Iowa Code section 550.2(4) defines a trade secret as information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process that is both of the following:
>
> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use.
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.
>
> *Iowa Code* § 550.2(4).

Iowa Code section 550.2(3) in pertinent part defines misappropriation as doing any of the following:

a. Acqui[ring] a trade secret by a person who knows that the trade secret is acquired by improper means.

b. Disclos[ing] or us[ing] a trade secret by a person who uses improper means to acquire the trade secret.

c. Disclos[ing] or us[ing] a trade secret by a person who at the time of disclosure or use, knows that the trade secret is derived from or through a person who had utilized improper means to acquire the trade secret.

*Iowa Code* § 550.2(3).

"Improper means" is defined as "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage, including but not limited to espionage through an electronic device." *Iowa Code* § 550.2(1).

*Econ. Roofing*, 538 N.W.2d at 646; *see 205 Corp.*, 517 N.W.2d at 550 (noting that sections 550.4 and 550.5 provide for damages or injunctions as recourse for misappropriation of trade secrets, respectively, and also quoting the statute's definition of trade secrets in 550.2(4));[7] *see also Pioneer Hi-Bred Int'l v. Holden Found. Seeds*, 35 F.3d 1226, 1238 (8th Cir. 1994) (finding that misappropriation of a trade secret under the common-law requires, *inter alia*, "improper means," but that improper means are not

_____

[7]One of the 1991 amendments to the Trade Secrets Act substituted the word "both" in Iowa Code § 550.2(4) for "either," thus defining a "trade secret" as requiring both the limitations stated in subdivisions (a) and (b). Acts 1991 (74 G.A.) ch. 35, § 1, eff. April 23, 1991; *see also Brown v. Iowa Legislative Council*, 490 N.W.2d 551, 554 n. 2 (Iowa 1992) (noting the change from "either" to "both" in § 550.2(4), and considering a claim brought before the change under the former version of the statute, and finding that efforts to keep source codes encrypted and intervention in litigation to assert trade secrecy were sufficient to satisfy § 550.2(4)(b), and therefore finding the information at issue qualified under the statute as a trade secret, without suggesting that the information failed § 550.2(4)(a)).

necessarily unlawful, and further finding that direct evidence of improper conduct is not required, and is rarely available; therefore, circumstantial evidence is sufficient, and an inference of misappropriation from limited facts is warranted, particularly where the secret is so unique its duplication would probably be improper);[8] *Diversified Fastening Sys., Inc.*, 786 F. Supp. at 1490-91 (identifying the essential elements of the Iowa act as later stated by the Iowa Supreme Court in *Economy Roofing*).

An essential element of a claim, for an injunction or damages, under the Trade Secrets Act is whether the information in question could legally constitute "trade secrets," just as it was under the pre-existing common-law protection for trade secrets under Iowa law. *See Econ. Roofing*, 538 N.W.2d at 646-47 (reversing district court's dismissal of trade secrets claim, because district court had erroneously concluded that the information in question "could never legally constitute trade secrets"); *205 Corp.*, 517 N.W.2d at 550-51 (also focusing on proper definition of "trade secret" to determine viability of claim under the act); *US West Commc'ns, Inc., v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993) (same); *see also Kendall/Hunt Publ'g Co. v. Rowe*, 424 N.W.2d 235, 245-46 (Iowa 1988) (common-law claim of misappropriation of a trade secret, brought before the Uniform Trade Secrets Act had been adopted in Iowa, identified the elements of such a claim as "'(1) existence of a trade secret, (2) acquisition of the secret as a result of a confidential relationship, and (3) unauthorized use of the secret'") (quoting

---

[8]The Eighth Circuit Court of Appeals's decision in *Pioneer Hi-Bred Int'l*, in which federal jurisdiction was based on federal questions under the Lanham trademark act, but which also involved a complicated pendent claim, under Iowa law, asserting misappropriation of trade secrets, does not address the Iowa Trade Secrets Act or any provision of Iowa Code Ch. 550. However, the *Pioneer Hi-Bred* litigation spanned many years, and was based on alleged misappropriation of trade secrets for corn seed that had occurred during the 1980s, prior to Iowa's passage of its trade secrets act. *See Pioneer Hi-Bred Int'l*, 35 F.3d at 1228-29.

*Basic Chems., Inc. v. Benson*, 251 N.W.2d 220, 226 (Iowa 1977)); *cf. Pioneer Hi-Bred Int'l*, 35 F.3d at 1235 (finding that the elements of a common-law misappropriation of trade secrets claim under Iowa law are those stated in *Basic Chemicals, Inc. v. Benson*, 251 N.W.2d at 226) (citing *Restatement of Torts*, § 757 cmt. b (1939), as embodying the definition of a trade secret; the court was not, however, faced with a challenge to the definition of a trade secret, but only considered whether the plaintiff had failed to keep the genetic messages for seed corn in question "secret," whether the defendant had actually possessed the protected genetic messages, and whether the defendant had obtained the material "by improper means."); *E.W. Bliss Co. v. Struthers-Dunn, Inc.*, 408 F.2d 1108, 1112 (8th Cir. 1969) (stating elements of a common-law misappropriation of trade secrets claim identical to those stated in *Basic Chemicals*); *Diversified Fastening Sys.*, 786 F. Supp. at 1491 (considering injunction under the Iowa Trade Secrets Act, and stating, "The court does not decide whether th[e] common law action [available under Iowa law prior to enactment of the uniform act] has been supplanted by Iowa Code Chapter 550, or whether elements of the tort outlined by the Iowa courts are equally applicable to an action under Chapter 550," then citing the elements of the common-law claim of misappropriation of trade secrets under Iowa law as stated in *Kendall/Hunt Publishing* and *Basic Chemicals*). In a case decided shortly before *Economy Roofing*, the Iowa Supreme Court rejected any common-law definition of trade secrets as applicable under the trade secrets act, because the court found that "the words of the statute are plain and unambiguous." *Compare 205 Corp.*, 517 N.W.2d at 550, *with Kendall/Hunt Publ'g*, 424 N.W.2d at 246 (finding that an exact definition of a "trade secret" under the common law did not exist, and employing a multi-factor test to determine whether information was or was not a trade secret). In *Economy Roofing*, the Iowa Supreme Court reaffirmed its broad interpretation of the definition of "trade secret" under Iowa Code § 550.2(4):

In a recent case we gave a broad interpretation of "information" that could legally constitute "trade secrets":

> Under the plain language of [Iowa Code section 550.2(4) ] "trade secret" is defined as "information" and eight examples of this term are provided. Although these examples cover items normally associated with the production of goods, "trade secrets" are not limited to the listed examples. Business information may also fall within the definition of a trade secret, including such matters as maintenance of data on customer lists and needs, source of supplies, confidential costs, price data and figures. One commentator explains:
>
> > Trade secrets can range from customer information, to financial information, to information about manufacturing processes to the composition of products. There is virtually no category of information that cannot, as long as the information is protected from disclosure to the public, constitute a trade secret.
>
> We believe that a broad range of business data and facts which, if kept secret, provide the holder with an economic advantage over competitors or others, qualify as trade secrets. *US West Communications, Inc. v. Office of Consumer Advocate*, 498 N.W.2d 711, 714 (Iowa 1993) (citations omitted).

*Econ. Roofing*, 538 N.W.2d at 646-47 (emphasis in the original). The court, after reaffirming this broad interpretation of a "trade secret" under the act, noted that whether or not information in question constitutes a trade secret is "a mixed question of law and fact." *Id.* at 648. The "legal part of the question" is whether the information in question "could constitute a trade secret under the first part of the definition of trade secret in section 550.2(4) ("'Trade secret' means information, including but not limited to a formula, pattern, compilation, program, device, method, technique, or process. . . .")."

*Id.* The "fact part of the question," on the other hand, arises from the remaining part of the statutory definition found in subdivisions (a) and (b) of § 550.2(4). *Id.* at 648-49. In other words, the factual question is whether the information is both of the following:

> a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by a person able to obtain economic value from its disclosure or use[; and]
>
> b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

*Iowa Code* § 550.2(4); *Econ. Roofing*, 538 N.W.2d at 649.[9]

In *205 Corp.*, the Iowa Supreme Court further explained these two factual elements of a trade secret. *205 Corp.*, 517 N.W.2d at 550-51. The court noted that as to the first limitation, in § 550.2(4)(a), the plaintiff must "show it derived economic value because the [confidential pizza recipes] were unknown to, and not readily ascertainable by, a person who would profit from their disclosure and use." *205 Corp.*, 517 N.W.2d at 550; *US West*, 498 N.W.2d at 714 (§ 550.2(4)(a) requires proof of "independent economic value"). In referring to "economic value," the Iowa Supreme Court has held this subsection of the

---

[9]In *Economy Roofing*, the Iowa Supreme Court held that a court's determination that information is not, and presumably a determination that information is, a trade secret in the course of a preliminary injunction hearing is not a "final" determination on the merits of the question, and therefore, does not remove the issue from contention at a trial on the merits. *Econ. Roofing*, 538 N.W.2d at 648. This, of course, is in keeping with the "general rule" this court has found applicable to preliminary injunction rulings under the law of the U.S. Supreme Court and this circuit. Furthermore, in the case before it in *Economy Roofing*, in which the district court had made only the legal part of the determination in the course of a preliminary injunction hearing, and the district court's determination on that part was clearly erroneous, the Iowa Supreme Court held that the court's refusal to reconsider the question at a summary judgment hearing was reversible error. *Id.* at 649.

statute "speaks to the value of the information to either the owner or a competitor; any information which protects the owner's competitive edge or advantage." *US West*, 498 N.W.2d at 714 (citing *Millgrim on Trade Secrets*, § 9.03(3)(f); *Stork-Werkspoor Diesel V.V. v. Koek*, 534 So.2d 983, 985 (La. Ct. App.1988)). Thus, the court has held, "information kept secret that would be useful to a competitor and require cost, time and effort to duplicate is of economic value." *Id.* (citing *Surgidev Corp. v. Eye Tech., Inc.*, 648 F. Supp. 661, 683 (D. Minn. 1986), *aff'd*, 828 F.2d 452 (8th Cir. 1987)).

However, the Iowa Supreme Court further indicated that "[b]eyond independent economic value, [the plaintiff] was required to show that it expended reasonable efforts under the circumstances to maintain secrecy of [its] [purported trade secrets]," and cited Iowa Code § 550.2(4)(b) for this second limitation. *205 Corp.*, 517 N.W.2d at 550. This second element of a trade secret under the Iowa statutory definition is in keeping with the recognition of "secrecy" as one of the elements of the common-law definition of a trade secret. *See, e.g., Pioneer Hi-Bred Int'l*, 35 F.3d at 1235 (citing *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 475 (1974), for the proposition that "[f]undamental to the existence of a trade secret is that the matter be, in fact, secret."); *Coenco, Inc. v. Coenco Sales, Inc.*, 940 F.2d 1176, 1178-79 (8th Cir. 1991) (same). In *205 Corp.*, the court concluded that the "key to this second element of the trade secret test is found in the words 'reasonable under the circumstances.'" *Id.* at 551 (in the case before it, the court found reasonable efforts under the circumstances even though all employees knew one of the recipes in question, because it was necessary for all employees to know it in order to maintain the freshness of the product by preparing it daily); *see also Pioneer Hi-Bred Int'l*, 35 F.3d at 1235 (common-law case holding, "The secrecy [of a purported trade secret], however, need not be absolute. Reasonable precautions to protect the secrecy of a trade secret will suffice") (citing, *inter alia*, *Surgidev Corp. v. Eye Tech., Inc.*, 828 F.2d 452,

455 (8th Cir. 1987), and focusing, in that case, on "unanticipated," "undetectable," or "unpreventable" methods of espionage as exceeding what could reasonably be guarded against).

### c.      Is the information in question "trade secrets"?

The court concludes, at least provisionally, for the purposes of this preliminary injunction ruling, that Interbake's recipes and manufacturing processes, with respect to ice cream sandwich wafers, constitute "trade secrets" within the meaning of Iowa Code § 550.2(4). As to the legal part of the question, the court concludes that this information fits the statutory list of "trade secrets" as including, but not limited to, "a formula, pattern, compilation, program, device, method, technique, or process . . . ." *See Iowa Code* § 550.2(4); *Econ. Roofing*, 538 N.W.2d at 648. As to the two companion factual tests of a "trade secret" under the Iowa act, the court finds, first, that Interbake has provisionally "show[n] it derived economic value because the [confidential recipes and processes] were unknown to, and not readily ascertainable by, a person who would profit from their disclosure and use." *205 Corp.*, 517 N.W.2d at 550 (§ 550.2(4)(a) is the source of this requirement); *see also Econ. Roofing*, 538 N.W.2d at 648; *US West*, 498 N.W.2d at 714. Although almost all the individual segments of Interbake's production system presumably are generally known to the baking industry, on the basis of the preliminary injunction record, the court concludes that the entirety of Interbake's manufacturing process, from ingredients through baking, is sufficiently unique to constitute a trade secret under Iowa law. This is particularly true with respect to the "mixing phase" of Interbake's process, as the order and timing of the mixing process are particularly key to making a consistently good wafer. Certainly, Interbake has "derived economic value" from its secret processes, because, it is one of the few bakeries that has somewhat perfected the wafer-making process, giving it a unique and unrivaled competitive advantage in the marketplace, as is

evidenced by its large market share. Moreover, Jacobsen testified that if he were to obtain the formulas, they would be valuable, although Jacobsen denied he would ever attempt to procure the recipes illegally. Hence, the value of such information would accrue to "either the owner or a competitor [and is] information which protects the owner's competitive edge or advantage." *US West*, 498 N.W.2d at 714.

Although the court has concluded that Interbake's information concerning recipes and production of ice cream sandwich wafers passes the "independent economic value" prong of the "trade secret" test under section 550.2(4)(a), the court is slightly more reluctant to conclude that it also passes the "reasonable efforts under the circumstances to maintain secrecy" prong of the test stated in Iowa Code § 550.2(4)(b). *205 Corp.*, 517 N.W.2d at 550; *see also Econ. Roofing*, 538 N.W.2d at 648 (§ 550.2(4)(b) provides the second factual inquiry of the trade secrets test). The court finds that Interbake has made some efforts to protect its trade secrets. For example, Interbake has a guard present all hours of the day and has a fence around its premises. Moreover, it does appear that the public's access, in general, is somewhat limited. Visitors are required to be escorted and large, public tours are discouraged. In addition, salaried employees, i.e., the management or supervisory employees, are required to sign a confidentiality agreement on an annual basis. However, these measures are significantly undercut by the fact that Interbake's confidentiality agreement can only be described as indolent, at best. Out of a seven-page agreement, Interbake devotes only three lines to protection of its confidential information when an employee leaves the company. Specifically, in this regard, the Agreement states:

> When an employee leaves the service of Weston[10] for any reason, confidential and proprietary information remains with and is the exclusive property of the Company and is not to be

---

[10]Interbake is part of the Weston family of companies.

> used nor disclosed in any way by the departing employee
> following the termination date of his or her employment with
> the Company.

Moreover, not every employee is required to abide by this code of conduct, as evidenced by the fact that lower-level employees who only have limited access to trade secrets are not required to enter into such an agreement. Interbake contends that the reason it does not require its employees to sign a confidentiality agreement is simply because its hourly employees only have "limited" access to protected information. Even more telling, however, is the fact that Interbake does not require a *single* employee to sign a covenant not to compete, despite the alleged highly-sensitive nature of Interbake's wafer manufacturing process. Interbake advances that the reasons it does not require such non-compete agreements is due to the fact that not all of the products it manufactures are confidential in nature. However, the court notes that drafting a covenant not to compete that applied specifically to the wafer department would not be a great undertaking and would have been the best (and least onerous) way to protect the highly sensitive information that has now hauled the parties into court. However, despite these obvious deficiencies, the court concludes that, on balance, under Iowa law, Interbake has expended "reasonable" efforts under the circumstances to maintain the secrecy of its trade secrets.[11] This conclusion is appropriate under Iowa law based on *205 Corp. v. Brandow*, 517 N.W.2d 548 (Iowa 1994). At issue in that case, was the allegedly confidential nature of pizza crust recipes. *Id.* at 549. Due to the special needs inherent in crust preparation, however, the secret recipe became known to all employees. *Id.* at 551. Moreover, the evidence was in conflict on the issue of whether the employees considered the crust recipe

---

[11]The court notes that Interbake is fortunate the standard is not "all reasonable precautions," as Interbake most assuredly would not meet such a standard in the view of this court.

confidential. *Id.* However, on the other hand, the plaintiff corporation showed that, when it purchased the restaurant, the former owner testified that none of the recipes were used by or given to the public. *Id.* In addition, the defendant-employee was informed the recipes were confidential and were not to be left anywhere readily accessible to others, and all recipes, including the crust recipe, were in a safe deposit box at all times. *Id.* Although the Iowa Supreme Court called it a close question, ultimately the court held the plaintiff's secrecy procedures were reasonable under the circumstances. *Id.* Thus, with respect to Interbake, although lower level employees were given limited access to the purportedly confidential information, this factor is not dispositive in cases where employees are required to have access to the formulas out of the necessity of preparation. *See id.* This is particularly true in cases where other evidence bolsters a finding that the recipes were not generally known or ascertainable. As was the case in *205 Corp.*, here, while the core ingredients are ascertainable due to the fact they are printed on the ice cream sandwich nutritional information, the exact assembly and baking processes are not determinable to the general public. *Id.* As such, despite the court's incredulity with respect to the fact a large corporation failed to secure a reasonable, narrowly tailored covenant not to compete, the court concludes Interbake's efforts to protect its trade secrets were reasonable under the circumstances, although it is an exceedingly close question. As a result, the information concerning recipes and manufacturing processes that Interbake seeks to protect from disclosure here by way of a preliminary injunction are indeed "trade secrets" entitled to that protection. Accordingly, the court concludes Interbake has shown a reasonable likelihood of success on its trade secrets claim to the extent that the information it seeks to protect is trade secrets under governing law. *Cf. United Centrifugal Pumps v. Cusimano*, 708 F. Supp. 1038, 1042-43 (W.D. Ark. 1988) (where the court simply could not tell if the information in question was trade secrets, even though the court

did not need to determine with certainty that the movant had a better than fifty percent chance of succeeding on the merits of its trade secrets claim, the court found no sufficient likelihood of success on the merits to issue a preliminary injunction on disclosure or employment with a competitor).

### d.    *Likelihood of a successful common-law claim*

As a further matter, the Iowa Supreme Court in *Economy Roofing* considered the question of whether, irrespective of whether the information in question constituted a "trade secret" within the meaning of the statute, the plaintiff should have been allowed to offer evidence that the defendants had breached a fiduciary duty to maintain the secrecy of the information considered confidential by their former employer. *Econ. Roofing*, 538 N.W.2d at 648.  The court read its prior fiduciary duty cases to encompass not only a fiduciary duty of an employee to an employer, but, more specifically, a fiduciary duty of an employee "to maintain the secrecy of the information [the former employer] described as trade secrets." *Id.* (emphasis added).  The court found that "misappropriation" of trade secrets under the Trade Secrets Act, § 550.2(3) and § 550.2(1), included disclosure when the person making the disclosure had acquired the information under circumstances giving rise to a duty to maintain its secrecy or limit its use, or had breached a duty to maintain secrecy, and also found that the defendants were employees subject to a fiduciary duty to their employer.  *Id.*  For both of these reasons, the court concluded that the plaintiff former employer should have been allowed "to present evidence on whether (1) the information in the computer constituted trade secrets under the statutory definition of trade secrets, and (2) [the former employee defendants] had a fiduciary duty to maintain the secrecy of this information."  *Id.* at 648.[12]  The court in *Economy Roofing* cited with

---

[12]  The court also held that although employees may take with them general (continued...)

approval the conclusion of the federal district court in *Norand Corp. v. Parkin*, 785 F. Supp. 1353 (N.D. Iowa 1990), in which the court, applying Iowa law, had found the likely existence of a fiduciary duty not to disclose trade secrets and confidential information in part by looking at the definition of "misappropriation" in § 550.2(3)(b), and therefore enjoined a former employee from accepting a position with a competitor. *Norand Corp.*, 785 F. Supp. at 1355; *see also Diversified Fastening Sys., Inc.*, 786 F. Supp. at 1491 (taking note of a plaintiff employer's assertion that there is an Iowa common-law fiduciary duty to maintain the secrecy of trade secrets and confidential business information, but finding that all of the information in question was probably trade secrets, and therefore there was sufficient likelihood of success on a statutory or common-law claim of misappropriation of trade secrets). This court reads these cases, at least for the purposes of ruling on the preliminary injunction motion, as standing for the proposition that disclosure of information the employer desires to keep confidential, and makes reasonable efforts to maintain as confidential, even if the information is not technically "trade secrets" under the statutory definition, may be enjoined as a violation of the common-law fiduciary duty of a former employee to a former employer. *See 205 Corp.*, 517 N.W.2d at 551 (holding that "Chapter 550 has not preempted all tort theories involving trade secrets"). Because the court finds, for the purposes of its preliminary injunction ruling, that Tomasiello was an employee subject to this fiduciary duty, and was certainly aware that Interbake valued the secrecy or confidentiality of the information in question irrespective of whether the information was technically "trade secrets" under the Iowa act, the court

---

[12](…continued)
knowledge acquired during their employment, an allegation that the employees took with them information surreptitiously copied or stolen and provided it to a competitor should have survived a motion for summary judgment. *Id.*

concludes that Interbake has also shown a reasonable likelihood of success under governing law on its claim that the information in question should not be disclosed, even if it is not trade secrets. The practical effect of this conclusion is to bring within the scope of any preliminary injunction not only the information provisionally held to be "trade secrets" above, but such other information as Interbake asserted in the preliminary injunction hearing was "confidential."

### d. Is there a likelihood of disclosure by "improper means"?

Governing law, in the form of the Iowa Uniform Trade Secrets Act, also provides a legal basis for Interbake's claim that its "trade secrets" have been "misappropriated," because, pursuant to § 550.2(3), Tomasiello's alleged disclosure of, and BoDeans's acquisition of these "trade secrets" would be through "improper means." *See Iowa Code* § 550.2(3)(a)-(c). "Improper means" include "breach of a duty to maintain secrecy." *Iowa Code* § 550.2(a); *Econ. Roofing*, 538 N.W.2d at 646. Here, Interbake has shown, at least to the extent necessary to demonstrate a reasonable likelihood of success on the merits of its claim, that Tomasiello was subject to such a duty not to disclose information Interbake considered trade secrets or otherwise proprietary or confidential. That duty arises, in the first instance, from the Confidentiality Agreement Tomasiello signed electronically on December 28, 2005. A breach of that duty would occur if Tomasiello were to disclose confidential information to BoDeans through his employment, and therefore any disclosure to BoDeans or any acquisition of that information by BoDeans from Tomasiello would be via "improper means" in violation of the statute. Here, however, Interbake has not affirmatively shown actual disclosure has occurred. Thus, Interbake must rely on the doctrines of threatened disclosure or inevitable disclosure, two related, although somewhat differentiated theories of recovery. A brief discussion of the interplay between the two doctrines is necessary.

The inevitable disclosure doctrine has, in certain situations, been used as a vehicle for demonstrating that an injunction is necessary to prevent the misappropriation of trade secrets. This doctrine is essentially a theory of relief for claims of misappropriation of trade secrets when an employee's new employment will "inevitably" lead him or her to rely on his former employer's trade secrets. *See PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (outlining the basic doctrinal requirements). In this case, Interbake's contention is that based on Tomasiello's knowledge of its trade secrets that were acquired during his tenure at Interbake and his new duties and incentives with BoDeans, it is inevitable that he will disclose Interbake's confidential and proprietary information to BoDeans, and thereby, violate the Iowa Uniform Trade Secrets Act. There has been some debate, however, among courts addressing the inevitable disclosure doctrine, not only with respect to what standard should govern, but also if the doctrine should even be applied. *Compare PepsiCo, Inc. v. Redmond*, 54 F.3d 1262 (7th Cir. 1995), *and Merck & Co. v. Lyon*, 941 F. Supp. 1443 (M.D.N.C.. 1996) (applying the inevitable disclosure doctrine), *with Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326 (S.D. Fla. 2001) (rejecting the inevitable disclosure doctrine and instead, relying on a theory of threatened disclosure only). For example, in the seminal case of *PepsiCo, Inc. v. Redmond*, the defendant-employee resigned his position at PepsiCo and began working at Quaker Oats Company, a competitor of PepsiCo's in the sport drink and new age drink market. 54 F.3d at 1264. At the time the defendant left PepsiCo, he had worked for the company for ten years, was employed in a relatively high-level position when he left and had extensive and intimate knowledge about PepsiCo's strategic goals for that year. *Id.* PepsiCo argued the information held by their former employee would be inevitably disclosed, not because the defendant would try to appropriate the marketing and advertising information, but because he would be able to anticipate the plaintiff's distribution,

packaging, pricing and marketing moves. The Seventh Circuit Court of Appeals agreed, stating that "PepsiCo finds itself in the position of a coach, one of whose players has left, playbook in hand, to join the opposing team before the big game." *Id.* at 1270. Thus, the court effectively converted the defendant's confidentiality agreement into a non-compete agreement by enjoining him from working for a direct competitor for a six-month period. *Id.*

Other courts have adopted *PepsiCo*'s reasoning where a noncompete agreement has been lacking, albeit with some limitations. For example, in *Merck & Co. v. Lyon*, 941 F. Supp. 1443 (M.D.N.C.. 1996), the district court in that case enjoined the plaintiff's former employee from working on a specific product marketed by the plaintiff's competitor. *Id.* at 1458. The court based its decision on the inevitable disclosure doctrine, but it also attempted to reign in the potential latitude of the inevitable disclosure doctrine by stating that reliance on the theory would only be appropriate in cases where the trade secret is clearly identified and of significant value. *Id.* at 1460. Moreover, in *Earthweb, Inc. v. Schlack*, 71 F. Supp. 2d 299 (S.D.N.Y. 1999), the Southern District of New York referred to the doctrine as "tread[ing] an exceedingly narrow path through judicially disfavored territory." In *Earthweb*, the court relied on the previous case of *DoubleClick, Inc. v. Henderson*, No. 116914/97, 1997 WL 731413 (N.Y. Sup. Ct. Nov. 7, 1997), where the court found an injunction was appropriate based on evidence of actual misappropriation, which was "bolstered by . . . a high probability of 'inevitable disclosure' of trade secrets." *Doubleclick*, 1997 WL 731413, at *5-6. Dovetailing on this principle, the court in *Earthweb, Inc.* held as follows:

> Absent evidence of actual misappropriation by an employee,
> the doctrine should be applied only in the rarest of cases.
> Factors to consider in weighing the appropriateness of granting
> injunctive relief are whether: (1) the employers in question are

> direct competitors providing the same or very similar products or services; (2) the employee's new position is nearly identical to his old one, such that he could not reasonably be expected to fulfill his new job responsibilities without utilizing the trade secrets of his former employer; and (3) the trade secrets at issue are highly valuable to both employers. Other case-specific factors should be considered as well.

*Earthweb*, 71 F. Supp. 2d at 310.[13] However, the *Earthweb* court also recognized that the inevitable disclosure doctrine is fraught with potential pitfalls. Specifically, the court recognized some of the drawbacks of the doctrine:

> While the inevitable disclosure doctrine may serve the salutary purpose of protecting a company's investment in its trade secrets, its application is fraught with hazards. Among these risks is the imperceptible shift in bargaining power that necessarily occurs upon the commencement of an employment relationship marked by the execution of a confidentiality agreement. When that relationship eventually ends, the parties' confidentiality agreement may be wielded as a restrictive covenant, depending on how the employer views the new job its former employee has accepted. This can be a powerful weapon in the hands of an employer; the risk of litigation alone may have a chilling effect on the employee. Such constraints should be the product of open negotiation. Another drawback to the doctrine is that courts are left without a frame

---

[13] One commentator has also delineated similar factors that courts have relied upon in determining whether disclosure is inevitable. D. Peter Harvey, *"Inevitable" Trade Secret Misappropriation after* PepsiCo, Inc. v. Redmond, 537 PLI/PAT 199, 226 (1998). These factors include: (1) Is the new employer a competitor? (2) What is the scope of the defendant's new job? (3) Has the employee been less than candid about his new position? (4) Has plaintiff clearly identified the trade secrets which are at risk? (5) Has actual trade secret misappropriation already occurred? (6) Did the employee sign a non-disclosure and/or non-competition agreement? (7) Does the new employer have a policy against use of others' trade secrets? (8) Is it possible to "sanitize" the employee's new position? *Id.* at 226-27.

of reference because there is no express non-compete agreement to test for reasonableness. Instead, courts must grapple with a decidedly more nebulous standard of "inevitability." The absence of specific guideposts staked-out in a writing will only spawn such litigation, especially as the Internet becomes a primary medium for ideas and commerce. Clearly, a written agreement that contains a non-compete clause is the best way of promoting predictability during the employment relationship and afterwards.

*Id.* at 310-11. Based on these drawbacks, many of the cases which have successfully applied the inevitable disclosure doctrine "involved the potential disclosure of trade secrets by employees who had expertise in highly technical industries." *Int'l Paper Co. v. Suwyn*, 966 F. Supp. 246, 258-59 (S.D.N.Y. 1997) (citing *Cont'l Group, Inc. v. Kinsley*, 422 F. Supp. 838, 841 (D. Conn. 1976) (applying doctrine in a case involving an engineer in the field of plastic container development); *Bus. Intelligence Servs., Inc. v. Hudson*, 580 F. Supp. 1068 (S.D.N.Y. 1984) (applying doctrine to a case involving the computer software industry)). In finding a likelihood of disclosure, other courts that have applied the inevitable disclosure doctrine assess the degree of competition between the former and new employer, and the new employer's efforts to safeguard the former employer's trade secrets, and the former employee's "lack of forthrightness both in his activities before accepting his job . . .and in his testimony," as well as the degree of similarity between the employee's former and current position. *PepsiCo*, 54 F.3d at 1267; *PepsiCo, Inc. v. Redmond*, NO. 94 C 6838, 1996 WL 3965, at *20 (N.D. Ill. Jan. 2, 1996) (citing *IBM Corp. v. Seagate Tech., Inc.*, 1991 U.S. Dist. LEXIS 20406, at *7 (D. Minn. 1991)). Stated differently, in granting injunctive relief under this doctrine, it appears that courts generally consider the present state and nature of the industries at issue to determine whether the alleged harm would be irreparable and that injunctive relief is granted in cases where

the employee's knowledge would allow a competitor to improve its business with little or no effort, *see Business Intelligence*, 580 F. Supp. at 1072, or where the present and former employers were "endeavoring to develop the identical product" and the breaching employee had "learned exactly how [his former employer] was making the [product]," including all details concerning the production process, which refinements in the process were producing improvements and failures, and how near to success development efforts were. *Kinsey*, 422 F. Supp. at 845.

*Int'l Paper Co.*, 966 F. Supp. at 258-59.

In contrast, however, stands *Del Monte Fresh Produce Co. v. Dole Food Co.*, 148 F. Supp. 2d 1326 (S.D. Fla. 2001). There, the court rejected the inevitable disclosure doctrine, at least as it understood its current status, because the court determined the standard was too prophylactic to be effective. In *Del Monte*, the defendant left his employer of sixteen years to go work for a competing fruit company. *Id.* at 1328-29. During his tenure at his previous employer, Del Monte, the defendant was the Director of Research and Development and then later, also held the position of Senior Vice President for Research and Development and Agricultural services. *Id.* at 1329. In its analysis, the court stated it would not apply the inevitable disclosure doctrine, because the case was governed by either Florida or California law, and Florida had not adopted the doctrine and California had specifically rejected it. *Id.* at 1336-37 (citing *See Bayer Corp. v. Roche Molecular Sys.*, 72 F. Supp. 2d 1111, 1117 (N.D. Cal. 1999) (holding that inevitable disclosure doctrine is insufficient for injunctive relief where there was no evidence of intent to disclose and in light of California's strong policy of employee mobility); *Computer Scis. Corp. v. Computer Assocs. Int'l, Inc.*, Nos. CV 98-1374-WMB SHX, CV 98-1440-WMB SHX, 1999 WL 675446, at *16 (C.D. Cal. Aug. 12, 1999) (stating that inevitable disclosure has been rejected by California); *see also H&R Block E. Tax Servs.*,

*Inc. v. Enchura*, 122 F. Supp. 2d 1067, 1076 (W.D. Mo. 2000) (rejecting assumption that exposure to trade secrets creates inference of inevitable disclosure); *EarthWeb, Inc.*, 71 F. Supp. 2d at 310 ("[I]n its purest form, the inevitable disclosure doctrine treads an exceedingly narrow path through judicially disfavored territory. Absent evidence of actual misappropriation by an employee, the doctrine should be applied only in the rarest of cases."); *Bridgestone/Firestone, Inc. v. Lockhart*, 5 F. Supp. 2d 667, 682 (S.D. Ind. 1998) (rejecting inevitable disclosure claim where misappropriation was not seriously threatened). However, the court in *Del Monte* went on to address whether the plaintiff had established "threatened disclosure," which it viewed as a separate and distinct theory, requiring proof beyond inevitability, essentially proof of "inevitability-plus," or stated differently, "a substantial threat of impending injury." *Id.* at 1337-38.

The Iowa Supreme Court has not specifically addressed or adopted the inevitable disclosure doctrine. In other cases applying Iowa law, this court has held that a plaintiff can prove trade secret misappropriation in violation of the Trade Secrets Act by proving inevitable disclosure, relying on Iowa Code § 550.3(1), which codifies protection against threatened misappropriation. *See, e.g.*, *Am. Express Fin. Advisors, Inc. v. Yantis*, 358 F. Supp. 2d 818, 833 (N.D. Iowa 2005) ("Under the Trade Secrets Act, a plaintiff can prove trade secret misappropriation in violation thereof by proving inevitable disclosure.") (citing *Iowa Code* § 550.3(1)). However, this court has never engaged in any substantial discussion of the slight nuances between a threatened disclosure and an inevitable disclosure. In an unreported decision, however, the Southern District of Iowa, addressed this very issue. *See Barilla Am., Inc.*, 2002 WL 31165069, at * 9-10 (S.D. Iowa 2002). There, the court noted that it was not entirely convinced that the two doctrines had to be analyzed as distinct and separate theories of recovery. *Id.* at *9. Rather, the court noted that inevitable disclosure is more than likely just one way of showing a threatened

disclosure. *Id.* However, the court did note that the inevitable disclosure doctrine and the threatened disclosure doctrine are aimed at different directions. *Id.* "The inevitable disclosure doctrine appears to be aimed at preventing disclosures despite the employee's best intentions, and the threatened disclosure doctrine appears to be aimed at preventing disclosures based on the employee's intentions." *Id.* In light of this, the court agreed the inevitable disclosure standard needed to be a strict one. *Id.* However, the approach the court ultimately took was to simply enforce a stricter standard on inevitable disclosure, and then treat it and the threatened disclosure doctrine as variations of the same standard. *Id.*

This court's review of the case law leads it to the same conclusion as the court in *Barilla*—namely, that the inevitable disclosure doctrine is just one way of showing a threatened disclosure in cases where additional evidence showing the existence of a substantial threat of impending injury is unavailable to the movant.

Turning to the case at bar, however, the court has serious doubts that the plaintiff has carried its burden under either standard. First, with respect to inevitable disclosure, during the hearing, it became apparent that BoDeans's manufacturing equipment and processes are distinguishable from Interbake's. BoDeans developed its wafer manufacturing plant from the ground up and specifically tailored its facility for its purposes. Utilizing the help of Joseph Cardinali, a long-time engineering consultant to the commercial baking industry, BoDeans researched and purchased state-of-the-equipment and technology, long before the name Larry Tomasiello had ever been mentioned to Jacobsen. Consequently, BoDeans's process is distinctly different from Interbake's, as mixing ingredients, oven temperatures, utilization of excess dough in the cutting and molding process, conveyor speeds and line length vary between the two facilities. Additionally, the cooling process is significantly different, as is the process through which moisture is extracted from the wafers. Moreover, BoDeans has developed its own recipes

for wafers from scratch, based on the recommendations of Wells' Dairy's consumer panel and an independent recipe development consultant, again, long before Tomasiello ever set foot in Le Mars, Iowa. In addition, Tomasiello's new position does not specifically deal with research and development. As a result, much of the information Tomasiello might possess "in his head" or elsewhere, would have to be modified substantially before it would be useful to BoDeans, with the exception of Interbake's secret recipes, which even Jacobsen himself admitted would be helpful, particularly in marketing. Outside of marketing, however, based on the evidence, even Interbake's secret recipes—the company's most important trade secret—would be of little value to BoDeans with respect to the actual production and development of wafers. This is so due to the substantial differences in equipment and significant distinctions that can be made in the companies' processing procedures, especially the different baking ovens, length of the processing lines and contrasting cooling and drying procedures. Moreover, it is highly improbable, in the opinion of this court, that Tomasiello has memorized these precise recipes and would be able to recite even one recipe from memory. In addition, Jacobsen has repeatedly admonished Tomasiello and advised him not to disclose Interbake's trade secrets and Tomasiello views this as a condition of his current employment. In light of the fact Tomasiello is in the process of moving his family over 1,000 miles to work at BoDeans, he would be undertaking a serious risk to threaten his current employment by disclosing a formula that would only be helpful after much tailoring. Thus, although the court can certainly understand Interbake's argument, particularly in light of the fact that BoDeans endeavors to expand its wafer business, the court determines that, without more, this is not one of those rare cases in which the inevitable disclosure doctrine should apply.

To this end, however, the plaintiff argues that it is able to meet the higher standard of "inevitability-plus," based on the fact that Tomasiello accessed myriad computer files

contained on Interbake's computer system just days before he announced his resignation. The court does find that the files he accessed contained highly sensitive wafer production information and that Tomasiello accessed numerous files during a relatively short period of time, raising a certain amount of suspicion. However, on this record, the court is unable to conclude that Tomasiello accessed these files maliciously and took the information with him to BoDeans as the plaintiff has alleged. Rather, at this juncture, the plaintiff simply has not carried its burden of proving that Tomasiello in any way copied, printed, downloaded or otherwise took any of these documents with him after he left Interbake. Perhaps additional discovery will shed more light on the plaintiff's contention, and if it becomes apparent Tomasiello took documents with him when he left Interbake, the court could easily be swayed to find the plaintiff has met the inevitability-plus standard, particularly in light of the fact that the court recognizes it is an exceedingly close question. This is particularly true in light of the fact that Tomasiello is unable to explain why he was accessing particularly sensitive files at that time. However, on the record currently before the court, the court is simply unwilling to conclude that Tomasiello downloaded, printed or personally retained these files. Consequently, the court concludes the plaintiff has not demonstrated a likelihood of improper disclosure at this stage in the litigation.

### 2. *Irreparable harm*

In addition to the requirement that the court consider all of the factors in the *Dataphase* analysis, in this circuit "a party moving for a preliminary injunction is required to show the threat of irreparable harm," *Baker Elec. Co-op.*, 28 F.3d at 1472 (citing *Modern Computer Sys.*, 871 F.2d at 738 and *Dataphase*), and the lack of irreparable harm is sufficient ground for denying or vacating a preliminary injunction. *Aswegan v. Henry*, 981 F.2d 313, 314 (8th Cir. 1992) (citing *Modern Computer Sys.*, 871 F.2d at 738). Stated differently, "[t]he threshold inquiry is whether the movant has shown the threat of

irreparable injury." *Glenwood Bridge*, 940 F.2d at 371 (quoting *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987)). Thus, the Eighth Circuit Court of Appeals has held that

> the movant's failure to sustain its burden of proving irreparable harm ends the inquiry "and the denial of the injunctive request is warranted." [*Gelco*, 811 F.2d] at 420. *Accord Modern Computer Sys.*, 871 F.2d at 738; *Dataphase*, 640 F.2d at 114 n.9. We must inquire, then, whether [the movant] has met its burden of proving that it will suffer irreparable harm absent a preliminary injunction.

*Id.* Sufficient showing on this second factor in the *Dataphase* analysis can be made, for example, by showing that the movant has no adequate remedy at law. *Baker Elec. Co-op.*, 28 F.3d at 1473. Conversely, where the movant has an adequate legal remedy, a preliminary injunction will not issue. *Frank B. Hall & Co. v. Alexander & Alexander, Inc.*, 974 F.2d 1020, 1025 (8th Cir. 1992) (but finding in that case that the district court's conclusion that there was an adequate remedy was based on an erroneous legal premise, and requiring a proper balance of *Dataphase* factors). This court, has on previous occasions, concluded that the disclosure of trade secrets to a competitor may cause irreparable harm. *See Uncle B's Bakery*, 920 F. Supp. at 1434-36; *Diversified Fastening Sys.*, 786 F. Supp. at 1492-93; *Norand Corp.*, 785 F. Supp. at 1355. The types of trade secrets at issue in this case are some of Interbake's most closely guarded proprietary and technical data. The court has found, at least provisionally, that Tomasiello agreed to be bound by the terms of the 2005 Confidentiality Agreement, and therefore concludes that, at least as to its trade secrets claims, Interbake has adequately demonstrated a threat of irreparable harm, because a breach of the agreement could certainly harm Interbake, particularly if that breach occurred in the realm of its secret recipes and formulas. Certainly, if the disclosure allows a competitor to cut corners in the research and

development process of wafer recipe development, the competitor will attain a competing product that much sooner, and it is this harm to Interbake that is irreparable. Although an employee is entitled to use the fund of general knowledge he or she has accumulated in the course of employment, that entitlement does not extend to use of trade secrets. In *PepsiCo.*, the Seventh Circuit Court of Appeals noted that the irreparable harm comes not from general skills and knowledge acquired by the former employee during his tenure with that former employer, but rather from "the particularized plans or processes developed by [the former employer] and disclosed to him while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors." *PepsiCo.*, 54 F.3d at 1269. However, it behooves the court to note that the threat of irreparable harm is somewhat tempered by the fact that any confidential or trade secret information that was disclosed would have to be scaled and tailored to fit within BoDeans's specific processes. Even in light of this fact, however, the court is aware of the seriousness of the harm that could potentially occur by disclosure of the trade secret and confidential information at issue. This is true despite the fact that BoDeans alleges it is satisfied with its recipes and processes, because there is absolutely no doubt in the court's mind that BoDeans is interested in expanding and perfecting its current formulas and processes. Thus, as admitted by Jacobsen, Interbake's recipes would indeed be valuable and usable for marketing and other purposes. Morever, simply because BoDeans argues it has no interest in Interbake's recipes and processes at this time, there is no way to predict whether, upon disclosure, BoDeans might sometime in the future decide to substantially alter its recipes and processes, should it ever ascertain that Interbake's formulas are superior. The defendants attempt to distinguish the current case from *Uncle B's Bakery, Inc. v. O'Rourke*, 920 F. Supp. 1405 (N.D. Iowa 1996), a case in which this court issued a preliminary injunction to prevent the disclosure of trade secrets

in a similar factual scenario, by asserting that the defendants in *Uncle B's* had not yet entered into a directly competitive market whereas BoDeans had already entered into the wafer market as a direct competitor of Interbake's prior to hiring Tomasiello. However, this argument misses the point because the disclosure itself is the irreparable harm, regardless of if the economic harm comes later in the form of application of the improperly disclosed information. Accordingly, the court finds there is sufficient threat of irreparable harm in this case to weigh in favor of granting a preliminary injunction. Thus, overall, the court concludes that the "irreparable harm" factor weighs in favor of the issuance of a preliminary injunction in this case. However, the court will still consider the defendants' argument that there is little "real" threat of disclosure of trade secrets in the course of Tomasiello's employment, such that he should not also be enjoined from employment with BoDeans.

### 3. Balance of harm

The court notes that the analysis of the next *Dataphase* factor, "the balance between the harm and the injury that the injunction's issuance would inflict on other interested parties," is not identical to the "irreparable harm" analysis. *Pottgen*, 40 F.3d at 929. Irreparable harm focuses on the harm or potential harm to the plaintiff of the defendant's conduct or threatened conduct. *Dataphase*, 640 F.2d at 114. In contrast, the balance of harm analysis examines the harm of granting or denying the injunction upon both of the parties to the dispute and upon other interested parties, including the public. *Id.*; *see also Glenwood Bridge*, 940 F.2d at 372 (considering the effect of granting or denying the injunction on the public's interest in a public works construction project as well as upon the parties in the balance of harm analysis); *Modern Computer Sys.*, 871 F.2d at 737-38 (harm to other interested parties also considered).

In conducting the balance of harm analysis required under *Dataphase*, it is obvious that an illusory harm to the movant will not outweigh any actual harm to the non-movant. *Frank B. Hall*, 974 F.2d at 1023. To determine what must be weighed, the court finds that courts of this circuit have looked at the threat to the each of the parties' rights that would result from granting or denying the injunction. *Baker Elec. Co-op.*, 28 F.3d at 1473. Also, the potential economic harm to each of the parties and to interested third parties of either granting or denying the injunction is relevant. *Id.* Another consideration in the balance of harms calculus is whether the defendant has already voluntarily taken remedial action. *Sanborn Mfg.*, 997 F.2d at 489. Where the non-movant has taken such action, the balance of harms is readjusted, because the potential for economic or other harm to the movant has been eliminated. *Id.* (citing *Burndy Corp. v. Teledyne Indus., Inc.*, 748 F.2d 767, 774 (2d Cir. 1984), which held that injunctive relief was "wholly unnecessary" when the defendant had voluntarily brought his product labeled with the UL mark into compliance with UL standards and where there was not a likelihood of repetition or hazard to the public). Similarly, present harm as the result of past misconduct is not sufficient to justify the injury to the non-movant of granting a preliminary injunction requiring some additional corrective action, because such relief "goes beyond the purpose of a preliminary injunction." *Id.* at 490 (emphasis in the original).

As to the balance of harms from enjoining disclosure of trade secrets or confidential information, the court finds that the balance once again tips in favor of a preliminary injunction. As the court has observed, Interbake stands to suffer significant injury, economic and non-economic, if disclosure of its trade secrets is not enjoined. The harm Interbake is confronted with is the disclosure of some of its most closely-guarded recipes and production information. The disclosure of this information to one of Interbake's main competitors would undisputably pose serious ramifications to Interbake, even if the

formulas had to be modified in order to be "usable" by BoDeans. In contrast, the harm suffered by BoDeans, if any, would be insignificant, as BoDeans would be no worse off if it is prevented from obtaining Interbake's trade secrets. Thus, at least with respect to disclosure of trade secrets and confidential information, the scales of justice clearly tip in Interbake's favor.

However, the balance of harms is more complicated with respect to the harm as to enjoining Tomasiello's continued employment with BoDeans. In *Curtis 1000*, the court found that, despite an employee's right to work, the balance of harms weighed in the former employer's favor. That conclusion, however, was based in part on the existence of a non-competition clause and an observation that the employee would not be precluded from working with his present employer, but only from competing with his former employer for certain customers. *Id.* at 1274. In the case now before the court, however, the plaintiffs did not seek a non-competition agreement from Tomasiello. This weighs heavily against entering an injunction that would prohibit Tomasiello from continuing employment with a competitor, particularly in light of the fact that Tomasiello has moved not only himself, but also uprooted his family to work for BoDeans. This presents the court with an arduous decision. The court is disturbed by the prospect of forcing an employee out of his job, particularly in a situation where a covenant not to compete has not been entered into. Essentially, Interbake, the industry leader who holds 95% of the market, is asking the court to overlook its total failure to have in a place a reasonable, narrowly-tailored covenant not to compete by binding its employees to an implied-in-fact restrictive covenant based on an infirm Confidentiality Agreement. Due to this rather large oversight on the part of Interbake, any harm that stands to be suffered by the plaintiff in this aspect is self-inflicted. Perhaps if Interbake were able to show Tomasiello actually took confidential information with him when he left Interbake or if BoDeans concocts a

new formula without the requisite financial costs and time typically devoted to such a process, thereby suggesting disclosure has occurred, the court would be more sympathetic to Interbake's contention. However, that is not the record before the court. Accordingly, despite the fact the balance of the harms weighs in favor of an injunction with respect to preventing the disclosure of trade secrets and confidential information, without more affirmative evidence of wrong-doing, the scales tip the other way with respect to enjoining Tomasiello from working for BoDeans.

### 4.      *The public interest*

The final factor in the *Dataphase* analysis is the impact of granting or denying the preliminary injunction upon the public interest. *Pottgen*, 40 F.3d at 929. The "public interest" factor frequently invites the court to indulge in broad observations about conduct that is generally recognizable as costly or injurious.[14] Here, however, the court finds the public interest embodied and articulated in the Iowa legislature's passage of the Iowa Trade Secrets Act. Thus, the court finds that the public interest in protection of trade secrets weighs in favor of an injunction to accomplish that end. *Accord Heather K. ex rel Anita K. v. City of Mallard, Iowa*, 887 F. Supp. 1249, 1266-67 (N.D. Iowa 1995) (finding the public interest more than adequately stated in legislation to accomplish the ends also sought by the proposed injunction). After reviewing all of the *Dataphase* factors, the court concludes as follows: (1) most of the relevant factors tip, to one degree or another, in

---

[14]The "public interest" factor involves, among other things, the "public's interest in minimizing unnecessary costs" to be met from public coffers. *Baker Elec. Co-op.*, 28 F.3d at 1474 (citing *James River Flood Control Ass'n v. Watt*, 680 F.2d 543, 544-45 (8th Cir. 1982) (per curiam)); *James River Flood Control Ass'n*, 680 F.2d at 544-45 (public interest served by avoiding "greater expenditures from the public treasury"). The public interest also favors enjoining false statements, and enjoining the safety risks arising from false labeling of products. *Sanborn Mfg.*, 997 F.2d at 490.

favor of granting a preliminary injunction in this case enjoining disclosure of Interbake's trade secrets; but (2) the same factors do not support the granting of a preliminary injunction enjoining Tomasiello's continued employment.

### D. The Requirements Of Fed. R. Civ. P. 65(c) & (d)

#### 1.    The scope of a preliminary injunction

Pursuant to Federal Rule of Civil Procedure 65(d), which requires, *inter alia*, that "every order granting an injunction and every restraining order . . . shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained . . .," the preliminary injunction in this case must specifically sets forth its terms.  The court finds that it is difficult to fashion an injunction of proper scope in this case because the Confidentiality Agreement fails to define what information is considered confidential and proprietary.[15]  Moreover, the plaintiff's Complaint and request for relief is equally as vague in this aspect. Consequently, the court's injunction will be fashioned based on the plaintiff's request for relief and any ambiguities that may arise as a result of this drafting will be narrowly construed against the plaintiff.  Additionally, although the court did not make this specific finding on the current record, out of an abundance of caution, the preliminary injunction shall require Tomasiello to return to Interbake any and all copies of any confidential and

---

[15]The court is mindful of the venerable decision of the Eighth Circuit Court of Appeals in *E.W. Bliss Co.*, 408 F.2d at 1113-17, in which the appellate court systematically found each provision of the injunction against former employees' disclosure and competition invalid as overbroad.  However, the court concludes that the present injunction, fashioned as indicated, would survive such scrutiny, in light of the need to protect Interbake from intentional and inadvertent disclosure of its trade secrets and confidential information.

proprietary information he may have in his possession. Moreover, the preliminary injunction shall require that Larry Tomasiello preserve all information stored digitally for a period of 180 days. BoDeans shall also be required to preserve all information currently stored digitally on its computers and servers relating in any way to the employment of Tomasiello and its ice cream sandwich wafer operations during the pendency of this litigation. The court cautions that if it is later discovered that, following the implementation of this injunction, that Tomasiello has failed to turn over a single copy of Interbake's trade secrets and confidential information, the court will exercise its discretion to punish Tomasiello to the fullest extent of the law.

### 2.    Fed. R. Civ. P. 65(c)'s security requirement

Interesting questions arise as to Federal Rule of Civil Procedure 65(c)'s security requirement in this case. In *Curtis 1000*, after extensive consideration of the decisions of courts concerning whether or not some security is always required before issuance of a preliminary injunction, and the mandatory language of Rule 65(c), which states that "[n]o restraining order or preliminary injunction shall issue except upon the giving of security by the applicant," this court concluded "requiring a bond in some amount before issuing a preliminary injunction is far the better course." *Curtis 1000*, 878 F. Supp. at 1279.

This case is no exception, and the court concludes that a bond in some amount is required. There are very sound policy reasons for the bond requirement, identified in *Curtis 1000. Curtis 1000*, 878 F. Supp. at 1275-79. First, the defendant who has been wrongfully enjoined has no recourse for damages in the absence of a bond. *Curtis 1000*, 878 F. Supp. at 1277-78 (citing *W.R. Grace & Co. v. Local Union 759*, 461 U.S. 757, 770 n.14 (1983)). Second, because a preliminary injunction proceeding is both expedited, resulting in only provisional findings of fact, and interlocutory, there is a higher chance that the district court will err in granting the preliminary injunction. *Id*. at 1278 (citing

59

*inter alia, Clark v. K-Mart Corp.*, 979 F.2d 965, 968 (3d Cir. 1992)). At the preliminary injunction hearing, Interbake did not press any contention that a preliminary injunction in this case, whatever its basis, should issue without bond. For all of these reasons, the posting of a bond in some amount will be required before the preliminary injunction in this case will issue.

Although there may be some split in authority as to whether or not imposition of any bond is mandatory, there is no split in authority that the amount of any bond actually imposed remains a matter of the court's discretion. *See Curtis 1000*, 878 F. Supp. at 1279-80 (citing cases so holding, and identifying some factors to guide the court's discretion). Of some help is the statement of the Eighth Circuit Court of Appeals that security should be imposed "in an amount that fairly protects the [defendants] should it be ultimately found that the [defendants] [have] been wrongfully enjoined." *Glenwood Bridge, Inc.*, 940 F.2d at 373. This case presents an unusual issue, however, because Tomasiello will be allowed to continue working at BoDeans in his current position. Consequently, the amount of potential damages is extremely limited. Regardless, out of an abundance of caution, the court will issue a bond in the amount of $1.00. This will adequately protect the defendants from any damages, even thought the likelihood of damages is small in this case. The court will therefore issue a preliminary injunction with the scope and bond requirement stated above.

### III. CONCLUSION

The court's application of the *Dataphase* factors in this case leads it to the conclusion that a preliminary injunction must issue enjoining disclosure of Interbake's trade secrets by Tomasiello and misappropriation of those secrets by BoDeans. However, the application of those same factors does not lead the court to conclude that a preliminary

injunction must issue enjoining Tomasiello's continued employment with BoDeans as it relates to wafer manufacturing. Accordingly, the court therefore concludes that a preliminary injunction of appropriate scope should issue after the posting of adequate security. Interbake's motion for a preliminary injunction is therefore **granted in part, and denied in part**.

**IT IS SO ORDERED.**

**DATED** this 13th day of November, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA

## PRELIMINARY INJUNCTION

WHEREAS, pursuant to Fed. R. Civ. P. 65(b), the court finds that there is a threat of disclosure of trade secrets and confidential information of plaintiff Interbake Foods, L.L.C., by defendant Larry Tomasiello, which poses a threat of irreparable harm to plaintiff Interbake Foods, L.L.C., and whereas, in light of all of the circumstances known to the court and upon a balance of the equities, the court concludes that a preliminary injunction should issue, defendants Larry Tomasiello and Bodeans Baking Company, L.L.C., BoDeans Baking Holding Company, L.L.C., and BoDeans Wafer Company, L.L.C., are hereby enjoined as follows:

1. Defendant Larry Tomasiello is hereby enjoined from violating his Confidentiality Agreement with Interbake Foods, L.L.C., and from the use and disclosure of Interbake's trade secrets and confidential information.

2. BoDeans Baking Holding Company, L.L.C., and BoDeans Wafer Company, L.L.C. are hereby enjoined from obtaining information from Larry Tomasiello that would create a breach of his Confidentiality Agreement.

3. Larry Tomasiello is required to return to Interbake all copies, in whatever form, of any confidential and proprietary information of Interbake, including, but not limited to, any information Tomasiello wrote, copied, printed, or downloaded onto CD-ROMs, floppy disks, or any other computer media before he left Interbake, or which he in any way re-created after his departure from Interbake.

4. Larry Tomasiello is required to preserve all information currently stored on his personal computers, personal digital assistant, mobile telephone, including any information stored on backup media for a period of 180 days from the date of this injunction.

5. BoDeans is also required to preserve all information currently stored on its personal computers, personal digital assistant, mobile telephone, including any information

stored on backup media, relating in any way to its recruitment and employment of Larry Tomasiello or its ice cream sandwich wafer operations during the pendency of this litigation, with the exception that any such information stored on a mobile telephone need only be preserved for a period of 180 days from the date of this injunction

6. This preliminary injunction shall be binding upon the parties to this action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order.

7. This preliminary injunction shall issue upon the giving of security of $1.00 by applicant Interbake.

8. This preliminary injunction shall remain in full force and effect until further order of this court.

**IT IS SO ORDERED.**

**DATED** this 13th day of November, 2006.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA